# SPECIAL TERM,

## ·JULY, 1877.

PRESENT ALL THE JUDGES EXCEPT ROYCE, J.

## THE VERMONT & CANADA RAILROAD COMPANY *v.* THE VERMONT CENTRAL RAILROAD COMPANY AND OTHERS.

### [ IN CHANCERY. ]

*Chancery. Pleadings. Consent Decrees. Receivers.*

The Court of Chancery appointed receivers of certain railroads and their property, pursuant to a mandate of the Supreme Court. The decree provided that " said receivers and said roads and property shall be at all times subject to the jurisdiction and orders " of the Court of Chancery. A consent decree, and other decrees and orders, were subsequently made from time to time, touching said receivership. The consent decree provided that the original cause should be continued on the docket of the Court of Chancery, and that any party in the cause might " apply to the court from time to time for further orders in the premises, as he or it may be advised." A special act of the Legislature, authorizing the compromise adjustment to be carried into effect, provided for petitions in that behalf instead of bills. The original parties to the cause continued, personally or by succession, to be parties for all the purposes for which the cause had been kept on foot. Other parties became interested after the consent decree, by connecting themselves with the current administration of the subject-matter of the trust, and thus, at least as far as form and judicial procedure were concerned, subjected themselves to the scope and operation of that and subsequent orders and decrees. *Held,* that as the subject-matter of the petition in this case, and the grounds on which it asked the action of the court, consisted of the proceedings, decrees, and orders in the original cause as thus kept pending, and of the administration of the property thereunder, that a *petition* was the form and manner for presenting those matters for the consideration and action of the court contemplated by the law under the original decree, and by the parties under the special act of the Legislature and the ensuing consent decree.

By a decree of the Court of Chancery, made pursuant to a mandate of the Supreme Court, receivers were appointed of certain railroads and railroad property, to receive the tolls and income thereof, and from time to time, as the same should accumulate, cause the same to be paid over in extinguishment of certain rent due from one company to the other. The administration of the trust continued under said de-

cree and mandate for the purpose designated, until the payment of said rent was otherwise provided for by a *consent decree* that embraced, mainly, matters not within the scope of the original bill, nor contemplated by said mandate and original decree, nor within the province of the court to make the subject of decree under the original bill, and which did not contemplate nor involve judicial determination and judgment as to its substantial and effective provisions, and looked to the establishment of a continuing and, practically, a permanent system of tenure, control, management and use in the service of all rights and interests involved. The trust thereafter continued to be administered under said consent decree, and under several subsequent like decrees in furtherance thereof, for a long space of time, without any adversary proceedings being instituted. *Held,* that as the purpose for which said receivership was created was effectuated by said consent decree, said receivership thereupon ceased; that said consent decrees added no force nor effect to the agreements and contracts on which they were based; that the petitioner, in the management of said roads and property under said decrees, was not, in a legal sense, a receiver, but only a *managing agent* for the parties in interest, having the character and office of an administrative trust; that its primary relations were to and with the *cestuis que trust,* and its claim for outlay, service, and expenses incurred, was to be established and satisfied with reference to that relation; and that, in view of that relation, there was no warrant of law for ordering a sale of the property for the purpose of discharging the debt created by such management.

APPEAL from the Court of Chancery.

In December, 1876, a petition was filed in this cause by the Central Vermont Railroad Company as receiver and manager of the Vermont Central and the Vermont & Canada Railroads, by various individuals who were alleged to be the owners respectively of bonds known as the first-equipment, second-equipment, third-equipment, Stanstead-Shefford-and-Chambly, guaranteed, and income-and-extension bonds, and by Thomas H. Perkins, J. H. Converse, and Estes Howe, represented as a committee acting in behalf of holders of bonds of all of said several classes. The Vermont Central, the Vermont & Canada, the Rutland, the Ogdensburg & Lake Champlain, and the Missisquoi Railroad Companies, the trustees of the first and second mortgages on the Vermont Central Railroad, the trustees of the mortgage on the Missisquoi Railroad, the acting committee of the, holders of said first and second mortgage bonds, and various individuals alleged to be holders respectively of bonds under all of said mortgages, and of bonds of the other successive issues before mentioned, were made defendants thereto.

The petition, which was heard by ROYCE, Chancellor, at St. Albans, in May, 1877, set forth, in substance, that for fifteen years the Vermont Central and the Vermont & Canada Railroads had been under the administration of the Court of Chancery in this cause, for the purpose of the execution of certain trusts in favor of the Vermont & Canada Railroad Company, the first and second

mortgage bondholders of the Vermont Central Railroad, and the
Vermont Central Railroad Company, particularly set forth in the
decrees in said cause, especially in the so-called compromise decree
of January 19, 1864, and had been operated during that time by
managers appointed by said court, and acting under its direction ;
that during such administration the managers, by direction of the
court, and for the purpose of executing said trust, had borrowed
large sums of money, to wit, the sum of $700,000, for which they
issued, under order of the court of September 7, 1865, ten-year,
eight-per-cent. bonds, insufficiently secured by special pledge of
certain equipment of the roads, of which sum $33,100 was out-
standing, due, and unpaid, — the sum of $300,000, for which they
issued, under order of the court of May 1, 1867, twenty-year,
eight-per-cent. bonds, known as second-equipment bonds, and in-
adequately secured by a pledge of certain other road equipment,
all of which bonds, together with $12,000 interest thereon, due No-
vember 1, 1876, were outstanding and unpaid—the sum of 444,400,
for which they issued, under order of the court of May 1, 1867,
twenty-year, seven-per-cent. bonds, known as Stanstead, Shefford
and Chambly bonds, inadequately secured by pledge of the stock,
and mortgage bonds of the Stanstead, Shefford & Chambly Rail-
road, all of which bonds, together with $15,554 interest thereon,
due November 1, 1876, were unpaid, — the sum of $1,000,000,
for which they issued under order of the court of April 13, 1869,
twenty-year, eight-per-cent. bonds, known as third-equipment
bonds, inadequately secured by pledge of certain other road
equipment, all of which bonds, together with $40,000 interest
thereon, due November 1, 1876, were unpaid, — the sum of $904,-
000, for which they issued, under order of the court of May 17,
1871, twenty-year, eight-per-cent. bonds, known as guaranteed
bonds, not specially secured, but constituting a general charge
upon the trust property, and being indorsed by the Vermont &
Canada Railroad Company, all of which bonds, together with
$36,160 interest thereon, due July 1, 1876, were unpaid, — and
the sum of $1,675,500, for which they issued, under order of the
court of April 20, 1872, thirty-year, eight-per-cent. bonds, known
as income-and-extension bonds, of which the amount of $700,000
were set aside for the retirement of the first equipment bonds, and
nearly all exchanged therefor, and subrogated to the same special
security, and the remainder of which constituted a general charge
upon the trust property, and all of which, together with interest
to the amount of $67,020, due November 1, 1876, were unpaid ;
that in addition to the funded debt so created, there was a large
outstanding floating debt against the trust property to the amount

of $2,000,000, all of which was due, or about to become due. The petition further set forth, that the Central Vermont Railroad Company was incorporated by act of the Legislature in October, 1872, for the purpose of reorganizing the Vermont Central and the Vermont & Canada Railroad Companies; was organized in the spring of 1873, and at the time of the filing of the petition was the receiver and manager of said roads; that the management of said roads under the administration of the court had become cumbrous and unwieldy, and was no longer practicable, was attended with large and disproportionate expense, and that the best interest, both of the security holders and of the public, demanded that such administration should be ended, and the roads brought under corporate management; that the credit of the receiver and manager had been destroyed by malicious and wanton attacks in the public press and elsewhere, and the receiver and manager thereby rendered unable to borrow money necessary to the further operation of the roads; that the immediate payment of the floating debt was necessary; that the manager had no available means, present or immediately prospective, or otherwise, wherewith to meet said payments; and that the only means of raising the money was the sale of the roads and trust property, which could not be beneficially sold in parts. The petition prayed that said trust debt might be declared a charge and first lien upon the Vermont Central and the Vermont & Canada Railroads and the equipment thereof, and upon all the assets and property of the receivership; that said roads, equipment, and property, might be sold under direction of the court, and that the receiver, the Central Vermont Railroad Company, might be permitted to become a bidder therefor; that the Vermont Central and the Vermont & Canada Railroad Companies, and the trustees of the first and second mortgages, might be ordered to release their interest to the purchaser; that proof of claims might be ordered and distribution made, under direction of the court; and for general relief.

The answer of the Vermont & Canada Railroad Company admitted that the Central Vermont Railroad Company had been acting as receiver in the cause, but alleged that as it had no bond on file as required by the order of the court, it was not so acting under direction of the court, as alleged in the petition. As to the claim of the various petitioners to hold certain bonds and represent certain securities, it left the petitioners to their proof. It alleged that the individuals represented as a committee of certain bondholders had no such interest in the securities represented as to enable them to join in the petition, and that the petitioning bondholders had no right to seek relief in that proceeding in any manner other

than that provided by the terms of the orders under which the
bonds were issued. The answer did not admit that the Vermont
& Canada and the Vermont Central Railroads had been under the
management of the court as averred in the petition, but alleged
that the Vermont & Canada Railroad Company brought the orig-
inal bill in the cause, April, 1855, on a lease of its road to the
Vermont Central Railroad Company, whereby, rent being in
arrear, said petitionee had a right to enter upon and operate the
roads of both companies until the rent was paid by the earnings
thereof, praying to be allowed so to do, or that receivers be ap-
pointed to do the same ; that the defendants thereto appeared
and pleaded, and such proceedings were had that in April, 1860,
a decree was entered in said cause, from which both parties ap-
pealed, and the cause taken to the Supreme Court, where it was
adjudged that said lease was valid and binding, and that said
roads should remain in the hands of receivers until rents in arrear
were paid ; that a mandate was drawn in accordance with that
judgment, and a decree entered agreeably to the mandate ; that
in September, 1863, said petitionee filed a petition setting forth
an agreement between the parties to the original bill for the issue
of stock by said petitionee, and praying for a decree supplementary
to the original decree ; that thereupon on January 19, 1864, the
court made a decree that provided that the capital stock of the
Vermont & Canada Railroad Company might be increased to
$2,000,000, and that that sum should thereafter be the basis for
the computation of rent provided for in the original lease, except
as thereinafter otherwise provided ; that the rent to be paid to
said petitionee should be eight per cent. per annum on said sum,
payable by the receivers semi-annually, in June and December of
each year, and chargeable as a first lien on the property and in-
come of both of said roads ; that all incidental expenses of said
petitionee should be paid by the receivers from the income of said
roads ; that said petitionee might issue stock in addition to said
sum of $2,000,000, to the amount of $250,000, for the purpose of
building an extension of its road to Canada line in the town of
Highgate, and that such stock as to payment of rent and priority
of lien should stand like stock previously issued ; that if it should
thereafter become the legal duty of said petitionee under its char-
ter to expend further sums of money in building or completing its
road, further stock might be issued and treated like that pre-
viously issued. The answer further alleged, that in April, 1866,
the trustees under the first mortgage on the Vermont Central
Railroad filed a bill in the cause in the nature of a supplemental
bill, to adjust the equities of the holders of first and second

mortgage bonds of said road, whereupon a decree was made, whereby it was decreed, among other things, that in all the arrangements thereby provided for, the prior and paramount rights of said petitionee under said lease and prior decrees should be preserved inviolate, and that all payments thereby provided for should be made only out of the clear profits of the business lawfully applicable to such payments, and after said rent to said petitionee had been paid ; that in pursuance of the decree of January 19, 1864, and by leave of court duly granted, the capital stock of said petitionee was duly increased until, on June 1, 1872, it amounted to $3,000,000 ; that all of said stock had been recognized by payment of rent thereon as provided in the decree of 1864, and treated, without objection, as a prior and paramount lien on the income of said road, as in fact it was, and that the incidental expenses of said petitionee had also been paid from time to time as provided for in that decree ; that by virtue of said decree said petitionee became and was entitled to receive the sum of eight per cent. per annum on its capital stock, and that the same was a prior and paramount lien on the income of said roads, and to be first paid out of the same as aforesaid ; that said decrees had not been vacated nor in any way modified, nor any proceedings had for that purpose, but that they were still in force ; that it was also still the duty of said receiver to pay said petitionee its incidental expenses out of said income ; that said rent and incidental expenses were in arrear in the sum of more than $1,000,-000 ; that under said decrees said petitionee was entitled to have the net income of said roads paid to it, and to have said roads operated for its benefit in accordance with the terms of said decrees, and that that could not be done if the prayer of the petitioners was granted. The answer further alleged, that in April, 1876, said petitionee presented a petition to the court, setting forth the foregoing facts, and praying that the Central Vermont Railroad Company, receiver as aforesaid, be ordered to pay the rent and incidental expenses overdue, with interest, to pay out of the net income of said roads the rent that had been adjudged to be a first lien thereon before using said income for any other purpose, and to pay said expenses as they should become due, according to said decrees ; and that notice of that petition was duly given, the petition duly entered in court, and was still pending. The answer admitted the issue of the bonds of the seven-hundred-thousand-dollar issue, but denied that they were issued by the authority of said petitionee, and alleged that they were not a lien on the trust property, nor on the income thereof, nor on either of said roads, but if they were a lien on any part of

64

the trust property, they were a lien on only certain equipment of said roads mentioned in the order respecting the issue of said bonds. The answer further alleged, that the Central Vermont Railroad Company, acting as receiver, had received money since payments were made on said bonds for the use of cars and engines named in the order respecting the issue of the bonds, which it had not paid to bondholders as required by said order, as it should have done if the bonds were a lien on the equipment and the earnings thereof, but which it had wrongfully applied in payment of itself and other creditors. of the trust; that it had wrongfully paid to holders of the bonds, money not earned by said equipment, but taken from the general funds of the trust, or derived from unauthorized loans by which the alleged floating debt was increased; that if those payments to bondholders were taken into account, there was nothing, in equity, due to them. The answer denied that any part of the principal of the second equipment bonds was due; denied all knowledge that the security provided for them by the order under which they were issued was inadequate; but alleged that if it was so, it was because the receiver had hired other equipment, and left the equipment that was pledged as such security to deteriorate; and alleged that such inadequacy, if any, gave the holders of the bonds no remedy against the trust property nor the roads; and answered otherwise as it had already answered in regard to the bonds of the first equipment loan.

As to the Stanstead-Shefford-and-Chambly bonds, the answer alleged that they were a lien only on the stock, bonds, and income of the road of that name, but that the receiver had paid to the holders of such bonds large sums of money in excess of such income, and incurred a personal indebtedness in so doing; and that nothing was due, in equity, to the holders of those bonds, and that no relief could be granted to them, except as provided by the order under which the bonds were issued. As to the third-equipment bonds, the answer was the same as to the bonds of the second-equipment loan. The answer admitted the issue of the guaranteed bonds, so called, but alleged that said petitionee never lawfully assented to their issue, and denied that they were a lien on the trust property as alleged in the petition; and alleged that the pretended indorsement of said petitionee of said bonds was made without authority, and was not binding, but that if binding, the holders of the bonds were not entitled to the relief sought, nor to any relief in this cause, other than such as was provided for by the order under which they were issued. The answer admitted the issue of income and extension bonds, but denied that the petitionee ever assented to their issue, or that they should be

made a charge on the trust property; denied that they were such a charge; alleged that the court had no power to make them a charge superior to the lien of the petitionee already established by decree as aforesaid; and alleged that the receivers had paid the interest on said bonds by borrowing money for that purpose without authority. As to that portion of said bonds issued in exchange for first-equipment bonds, the answer was the same as to the first-equipment loan. As to the said orders subsequent to the final decree in the cause, the answer alleged that they were binding and valid only so far as they were duly assented to by the parties whose rights were thereby affected, the court having no right, otherwise, to fix any liability lessening the rights of said petitionee as established by said decree. The answer further alleged that the property pledged for the security of said equipment loans was distinct and capable of easy separation; that the securities might be easily enforced against it to the full satisfaction of the sums due on said bonds; and that the bondholders could justly have no further security nor any right to participate in the income of the receivership, nor the proceeds of a sale of the property thereof; that each class of the holders of the Stanstead-Shefford-and-Chambly, the income-and-extension, and the guaranteed bonds, had a special remedy provided by the order of court under which the bonds of each class were issued, and that in no event could any class have any general relief against the receivership property until its special security was exhausted, if at all. As to the alleged floating debt, the answer left the petitioners to their proof, but denied that, if it existed, there was any considerable amount thereof that constituted a charge in law or in equity on the trust property; and denied that any part thereof constituted a charge on either of said railroads; denied that the receivers had ever had either of said railroads, or any real estate belonging to either of those companies, in their possession or management for any purpose other than that of said decrees; and denied that they ever were trust property, or subject to the imposition of any lien through the agency of said receivers; and alleged that the receivers had no authority to make said floating debt a lien on said railroads, or the property in their hands, in any event, except in subordination to the paramount rights of said petitionee, or any authority to incur any liability constituting a lien on the income of said roads and property, unless by special pledge of certain designated classes of equipment. The answer further alleged, that the earnings of said petitionee's road had at all times been much more than enough to pay for operating expenses and for repairs and improvements; that all legitimate .

extensions and enlargements of said roads had been provided for by a corresponding increase of capital; that the floating debt was owing, mainly, to the large sums improvidently expended by the receivers in operations beyond the legitimate business of the trust, entered into by said receivers of their own motion, without the order of the court or the assent of said petitionee; that said debt, as well as the funded debt, was held in great part by the Central Vermont Railroad Company, or persons interested therein, who well knew when they took the same that the debt was incurred without authority, and contrary to the provisions of said decrees, and constituted no valid lien on said railroads or the property thereof. The answer admitted the making of improvements on the Vermont Central and the Vermont & Canada Railroads, and the building of docks and wharfs at Burlington, but alleged that the receivers had had the stock of the petitionee with which to pay for the same; denied that any improvements had been made on the Vermont Central Railroad other than the usual and necessary repairs, for which the earnings of the road had been much more than sufficient to pay; denied that said receivers had authority to borrow money or to charge said roads or the trust property for the making of said improvements; denied that the debts named in the petition, or any of them, were incurred under direction of the court so as to become a lien on said roads and the trust property; but alleged that no lawful proceedings had been had in the cause, invalidating or in any way changing the rights of said petitionee under said decrees; and that all proceedings in the cause subsequent to said decrees, were subordinate thereto; admitted that the Central Vermont Railroad Company was incorporated for the purpose of enabling those interested in the property to consolidate their interests in a corporation; but alleged that it was not used for that purpose, but in the interest of those hostile to those who were legally entitled to the earnings of said roads and property, to the prejudice of the interests of those having equitable liens on the earnings of said roads and property, and not in accordance with any rights conferred by the charter of said company; alleged that said company, having become receiver, had no right to become a creditor of the trust and, as such, to ask for the enforcement of its claims by a forced sale, and against the right of the parties for whose benefit the receivership was created; admitted that the present management was cumbrous and unwieldy, but denied that the management of said roads under direction of the courts was no longer practicable; alleged that if the credit of the receiver had been destroyed as alleged, it was by knowledge of the fact that the receiver had wrongfully in-

Vermont & Canada R. R. Co. *v.* Vermont Central R. R. Co. et als.

curred an erroneous debt that it was wholly unable to pay; denied that a sale of either of said railroads or of the equipment thereof, or of the trust property, was necessary for the purposes in the petition alleged; alleged that there were certain portions of the trust property that could, without injury, be independently sold, and that there were other parts that could be so sold when the trust should be relieved of divers ruinous arrangements that the receivers had entered into; insisted that no sale should be made except upon terms that would fully protect the paramount rights of the petitionee and its title to its road; alleged that an accounting had been had before special masters, of the expenditures of certain receivers appointed in the cause, and that said petitionee then appeared and insisted that the receivers should account for misappropriation of trust funds, but that said masters had made no report; alleged that the petitionee expected that as a result of said accounting said receivers would be ordered to pay over large sums of money so misappropriated; that the available funds of the trust would be thereby largely increased, and that said petitionee would have a first lien on any sum so paid over to the extent of its unpaid rents and incidental expenses; alleged that said accounting covered only the time from 1861 to the time when the Central Vermont Railroad Company took possession of said roads as receiver, in July, 1873; that no accounting had been had for the time that that company had been receiver, and that the company had filed only partial accounts of its receipts and disbursements, and prayed that an examination of its accounts might be ordered; alleged that the petitionee believed that upon such an accounting it would appear that said company, as receiver, had misappropriated the trust funds, contracted with itself as receiver, and thereby made large profits, allowed its officers to make gains out of such contracts, and had otherwise wrongfully used its position as receiver to make, and to allow its officers to make, profits to the injury of the creditors of the trust, and especially to the injury of the petitionee; and that it should pay over on account thereof the sum of $2,000,000. The answer further alleged, that if there was any debt then due that was a lien superior to the petitionee's, it should be paid out of the earnings of said roads, without resorting to the remedy asked for by the petitioners; that it would appear from the petition and the papers and proceedings therein referred to, that the petitioners were not entitled to the relief asked for; that it could not be had on petition, but only on a bill, if at all; and that the court had no right to grant that part of the relief prayed for that would require the petitionee to release its road and property to a purchaser thereof.

The answer, as to all matters not specifically answered, left the petitioners to their proofs.

The answer of the Rutland Railroad Company alleged, that on December 30, 1870, said company entered into a contract with J. Gregory Smith, Joseph Clark, Worthington C. Smith, and Benjamin P. Cheney, then trustees and managers of the Vermont Central and the Vermont & Canada Railroads, in their capacity of trustees and managers, whereby it was agreed that said trustees and managers should have the use and control of the Rutland and the Addison Railroads, and of certain other railroads and property described in said contract and in an assignment of lease of January 30, 1871, on terms therein expressed; that payment of the rent therein reserved was secured to the answering petitionee by certain covenants and stipulations in said contract and assignment of leases, and by two certain orders of January 30, 1871, drawn by said trustees and managers, one on the Connecticut River Railroad Company, directing said company to pay said petitionee the monthly balances that might be due from said company to said trustees and managers on account of business passing over the Vermont Valley Railroad, to an amount not exceeding $30,000 per month on an average, during the term of said contract, and subject to be revoked only when said trustees and managers should be ousted from the possession and management of the railroads and property so leased, under any of the stipulations of said contract,—the other, on the Cheshire Railroad Company, for payment of $10,000 per month during 1871, and $20,000 per month during the term of said contract, and being in its terms otherwise like the other, which orders were duly accepted by the companies on which they were respectively drawn; that on the petition of said trustees and managers, dated January 5, 1871, and duly filed in the office of the clerk of the Franklin County Court of Chancery, setting forth said contract, said court, on the same day, finding that said contract was a fair and equitable one, ordered and decreed that the action of said trustees and managers in entering into said contract be ratified and confirmed, directed said trustees and managers to execute the contract according to its terms, and declared the liabilities so incurred by said trustees and managers to be a charge on the trust property and the earnings thereof; that on or about February 12, 1873, said trustees and managers surrendered to said petitionee the steamer Oakes Ames, the Montreal & Plattsburgh Railroad, with its furniture and dock property, the property of the Whitehall & Plattsburgh Railroad, mentioned in the contract of December 30, 1870, and the northern and southern divisions of the last-named railroad,

except that part of said southern division extending from Ticon-
deroga, New York, to its junction with the Addison Railroad at
the State line, but upon the express agreement that such surren-
der should not affect the rights of said petitionee, nor its security
for the payment of its rent and the performance of the conditions
of said contract as confirmed by said order of court in respect to
the other railroads and property remaining in possession of said
trustees and managers, all of which was ratified and approved by
said court; that on February 25, 1876, said petitionee and the
Central Vermont Railroad Company, successors in the trust of
said trustees and managers, entered into a certain other contract,
modifying said contract of December 30, 1870, as therein set
forth, which was duly ratified by the stockholders of the respective
corporations, and approved and confirmed by said court; that at
the time both of said contracts were entered into, the trustees and
managers for the time being, were, as said petitionee well knew,
in possession of, and operating in behalf of said trust, the Lake
Champlain & Ogdensburg Railroad, under a contract between that
company and said trustees and managers, by the terms of which
said trustees and managers were to have the use and control of
that road for the term of twenty years from March 1, 1870, on
terms and conditions and for rent as therein expressed, to which
contracts the Vermont & Canada Railroad Company was a party;
that said Ogdensburg Railroad, in connection with the Vermont &
Canada, the Sullivan, the Rutland, the Addison, the Vermont
Valley, and the Vermont & Massachusetts Railroads, referred to
in the contract of December 30, 1870, formed a connected line of
railroad, under the management of said trustees and managers
and their successor in said trust, extending from Ogdensburg,
New York, to Bellows Falls and South Vernon, Vermont, points
where said line connected with the Cheshire Railroad and the
Connecticut River Railroad, respectively, thereby greatly increas-
ing their traffic; that at the time the contracts of December 30,
1870, and of February 25, 1876, were entered into, the earnings
of the Ogdensburg & Lake Champlain Railroad and of the other
roads controlled by said trustees and the Central Vermont Rail-
road Company under the decrees and orders made in this cause,
belonged to the trust whereof said trustees and said company
were respectively trustees and managers, or receivers and mana-
gers; that said petitionee, by virtue of said contracts and of the
orders confirming them, had a lien on the earnings of the Ogdens-
burg & Lake Champlain Railroad, and of the other roads affected
by or run for the benefit of said trust, which it was the duty of
said trustees and managers and said company to protect by com-

pliance with the terms of the contract entered into by said trustees with the Ogdensburg & Lake Champlain Railroad Company, until ousted from possession of the Rutland, the Addison, the Vermont Valley, and the Vermont & Massachusetts Railroads as aforesaid; that the Central Vermont Railroad Company was still in possession of the roads and property acquired of said petitionee, having never been ousted therefrom; that it was provided by the contract of February 25, 1876, that the orders drawn against said earnings, and upon the Cheshire and the Connecticut River Railroad Companies, should "not be revoked," but should stand as a continuing security for the payment of the rents therein "stipulated to be paid," and should be "treated as a material part" of said agreement; that all other provisions, covenants, conditions, &c., of the contract of December 30, 1870, and of the assignment of January 30, 1871, not therein expressly modified, should remain in full force, and apply to the contract of February 25, 1876, with the same effect as if therein set forth; and that all the liens given to said petitionee by the contract of December 30, 1870, and said orders confirming the same should remain in full force; that the earnings on which said petitionee had a lien as aforesaid, included the earnings of the Ogdensburg & Lake Champlain, the Vermont & Canada, the Vermont Central, and the Rutland Railroads, and of the Rutland leased roads and property, still remaining in possession of the trust; and that said petitionee would not have entered into said contracts, or either of them, nor parted with the use and control of said roads and property, if said lien on said earnings had not been made to secure payment of rent and performance of the conditions of the contract on the part of the trustees and managers, as the trustees and managers well knew.

The answer further alleged, that said trustees and managers were not receivers under any order or decree in this cause, but were trustees and managers to carry on the business of the roads, and held themselves to be such in negotiating and executing the contract of December 30, 1870; that said contracts having been entered into by leave of the chancellor and with the consent of all parties interested in the trust, were subject to the incidents and benefits in respect to remedies thereon and relief therefrom that the law accorded to ordinary parties; that said petitionee was unaffected by the nature of the trust and decree referred to in said petition, or the character of its agents managing its business; and that the court had no power to order a sale for the causes alleged, nor for any cause, in a summary proceeding on petition. The answer admitted that the Central Vermont Railroad Com-

pany was incorporated as alleged in the petition, but alleged that
it was for the purpose alleged in a petition filed in said cause by
said trustees and managers, purporting to have been sworn to on
June 2, 1871, wherein it was alleged, among other things, that
the Central Vermont Railroad Company was a corporation,—that
the books for subscription to the stock thereof were duly opened,
and stock to the amount of $2,013,700 duly subscribed for by re-
sponsible persons,—that said corporation had been duly organ-
ized and directors elected,—that said corporation was empowered
*temporarily* to operate the railroads then under control of the
board of management,—that it was created, among other things,
to furnish a medium of relief from the pecuniary embarrassment
of the trust,—and that, if admitted to the possession of said
roads and property, it proposed at once to assume all contracts
and pay all debts and liabilities incurred by said managers for or
on account of the trust, and as soon as practicable, to count into
the capital stock of said company, or purchase and retire, the
first and second mortgage bonds of the Vermont Central Railroad
and other securities appertaining to the trust ; that on June 21,
1873, on hearing of that petition, the chancellor, relying on the
representations therein made, by order of that date, discharged
said trustees and managers from the management of said trust, so
far as their control of said roads and property was concerned,
and appointed in their stead the Central Vermont Railroad Com-
pany trustee or receiver in said cause, subject to the decrees and
orders theretofore made and thereafter to be made ; that said
court further ordered that the Central Vermont Railroad Com-
pany, as receiver and manager, should assume and pay all debts
and liabilities incurred by the outgoing receivers and managers
for or on account of the trust, and should also pay them whatever
sum should be found due them on settlement of their accounts as
fast as the same became due and payable, and should fully pro-
tect and indemnify them from all personal liability on account
thereof.   The answer further alleged, that the Central Vermont
Railroad Company succeeded to the management of said roads
and property under said order, accepted the appointment on the
terms therein expressed, and was immediately let into possession
of said roads and property, wherein it had ever since remained ;
that said company, having thereby undertaken to pay the debts of
the trust, bound itself in its corporate capacity to and with the
trustees and managers and with the court, to pay said debts, but
that it had hitherto neglected so to do, although said order had
remained in full force ; and that the subscription to the capital
stock of said company which constituted a fund for the payment

65

of said trust debts remained unpaid ; that the collection thereof should be enforced for that purpose, before any other order was made on the petition, affecting the right or interest of any other party interested in said trust. The answer admitted that said trustees and managers had made various issues of bonds, but as to how, when, and for what purpose, and as to the benefit therefrom to the trust, it left the petitioners to their proofs, particularly insisting upon proof as to whether the managers were interested therein or holders thereof ; alleged that there should be an accounting, to determine the amount of the trust debt thereby incurred, before a sale was ordered as prayed in the petition ; and denied that said securities constituted a valid lien on the trust property or any part thereof, or at least a lien having priority over the lien of the petitionee for the payment of its rents under said contracts. The answer further alleged, that since the execution of the contract of February 25, 1876, the Central Vermont Railroad Company had failed to pay the rent due the Ogdensburg & Lake Champlain Railroad Company, and in consequence thereof had been ousted from possession of said company's road, and lost control of its traffic and earnings, in which said petitionee had an interest by virtue of the orders drawn on the Cheshire and the Connecticut River Railroad Companies as aforesaid ; that in consequence thereof said petitionee had lost its lien on the earnings of said road, and said earnings had been greatly diminished ; that a sale of the roads and property belonging to the trust would still further lessen if not destroy its remaining security ; that the Central Vermont Railroad Company was already in default in the payment of rent due to said petitionee to the amount of $11,500, exclusive of interest. The answer admitted that the credit of the management had been greatly impaired, but alleged that it was by reason of the amount of its debts and the high rate of interest payable thereon. The answer also alleged that the property sought to be sold was not sufficiently described in the petition, and that the court could make no order in respect thereto ; that the petition was brought pursuant to a scheme for reorganizing the Central Vermont and the Vermont & Canada Railroads on terms agreed upon by the petitioners, and that the court should not aid therein ; that the petitionee was willing to accept a surrender of its road and property, and adjust all matters in relation thereto as provided in said contracts ; that the bondholders mentioned in the petition and joining therein had no right to represent others similarly situated and not joining therein ; and that on the facts in the petition alleged, the petitioners were not entitled to the relief sought.

The answer of Francis A. Brooks, a holder of a large amount

of said second-mortgage bonds, alleged that the suit in which the petition was filed was instituted solely to enforce the provisions relating to rent and security therefor contained in the instruments of lease entered into in 1849 and 1850 between the Vermont & Canada and the Vermont Central Railroad Companies in which suit final decree in favor of the former company was entered in July, 1861 ; that as the only question presented for adjudication by the original bill related to the right of the Vermont & Canada Railroad Company to the road or the earnings of the Vermont Central Railroad Company as security for rent, no other questions were, or lawfully could have been, passed upon by the court, and that no other questions were in fact presented for adjudication in said cause prior to the entry of said final decree ; that by said decree it was provided that the Vermont Central Railroad and all property thereof should be and remain in the possession of Lawrence Brainerd, Joseph Clark, and John Gregory Smith, as receivers, for the purpose of satisfying said decree, and that said receivers should pay over all sums accruing from the earnings of said railroad property, until the sums then due and growing due to the Vermont & Canada Railroad Company under the lease of its road, amounting in all to $4,048.08, should be fully paid, and that said decree made no provision, except for the extinguishment of the claims of said company ; that by common consent of the Vermont & Canada and the Vermont Central Railroad Companies and certain holders of Vermont Central first-mortgage bonds, an agreement was entered into for the purpose of satisfying all arrears of rent due to the Vermont & Canada Railroad Company without paying the same in money, by which it was agreed that the receivers then acting under said decree should continue to act in the same capacity for the purpose of collecting and paying over to the Vermont & Canada Railroad Company the sums subsequently to accrue and come due to said company as rent of its road—the Vermont & Canada Railroad Company acceding to said agreement only on condition that its lease should remain in force ; that it was further agreed that the surplus net income should be paid in the first instance to the holders of the first-mortgage bonds, until all sums due and payable to them should be paid, then in like manner to the holders of second-mortgage bonds, and any remaining surplus to the Vermont Central Railroad Company ; that said agreement, with other matters not included therein, and not proper to be introduced into any order or decree, were in fact embodied in a decree entered in said suit on January 19, 1864, termed the compromise decree of 1864, which the answer admitted to be valid as between the parties consenting thereto so far as it expressed

their agreement, and no further; that in pursuance of said agreement and decree, and soon after the decree was entered, all arrears of rent due and payable to the Vermont & Canada Railroad Company prior to June 1, 1864, were paid by an issue of capital stock of that company to the amount of $600,000, whereby said decree became satisfied and of no further effect; that said compromise agreement and the decree thereon, together with said issue of stock, and the issue of additional stock in liquidation of the sums used by the receivers in constructing the Swanton Branch Railroad to the amount of $250,000, amounted to an accord and satisfaction, not only of the original suit, but of all demands then existing between the parties thereto, to wit, the Vermont & Canada and the Vermont Central Railroad Companies; that neither by the adjudication in said suit, nor by the agreement of parties, was the Vermont & Canada Railroad Company ever entitled to hold the Vermont Central Railroad or the specific property of that company, chargeable with the payment of rent under said lease, or to hold anything but the income of said road so chargeable; that so far as the decree of January 19, 1864, purported to make said rent payments a charge on the Vermont Central Railroad or the specific property thereof, it was unauthorized and void; that the allegations in the petition of the Vermont & Canada Railroad Company, setting forth that the court had, in its decree of 1861, declared said rent to be a charge on the Vermont Central Railroad and its property, were false, and calculated to deceive the chancellor to whom the petition was presented, and did in fact deceive him; that ever since the compromise agreement, the receivers in possession of the Vermont Central Railroad had sustained the relation of receivers to the Vermont & Canada Railroad Company, in the same manner as under the decree of July 13, 1861; that as to the surplus net income not required for the payment of the rent of the Vermont & Canada Railroad, said receivers had taken upon themselves the disbursement of the same pursuant to the provisions of the decree of 1864, not by virtue of any duty or office devolved upon them by the court, but by agreement of parties and of their own motion; that as to the holders of first and second mortage bonds who were not parties to the suit, the receivers stood in the relation of trustees for such surplus net income in their hands at any time; and that such surplus net income, after coming into possession of said receivers by virtue of said agreement, as to the appropriation thereof, became lawfully set apart and appropriated for the benefit of said holders of first and second mortgage bonds to the amount of all sums due and payable to them on their bonds respectively, and so remained;

and that, except as aforesaid, the Vermont Central & the Vermont & Canada Railroads, as such, had never been under the administration of the court in said cause at any time, as alleged in said petition, and were not then, except only so far as said receivers were authorized by the court to operate said railroads for the purpose of collecting the income thereof and disbursing the same, as provided in the decree of January 19, 1864, so that the administration of the general affairs of said railroads never passed from the corporations themselves into the hands of the receivers, as intimated in the petition. The answer denied that said railroads constituted the trust property or trust fund in the hands of said receivers, or any part thereof, or that said receivers as such, then or ever had any property, title, or ownership in or to the Vermont Central and the Vermont & Canada Railroads, or either of them, or the property thereof, for any purpose. The answer further alleged, that while the Supreme Court in its determination of the original cause refused to recognize the existence of any lien or charge on the specific property or estate of the Vermont Central Railroad Company in favor of the orator in said suit, or of any trust attaching to said property or estate in favor of the orator, it determined that the orator was entitled, as a creditor of the defendant company, to receive a certain sum as and for the rent of its railroad, at the rate of 8 per cent. per annum on $1,348,500, and that for such amount, and no more, the orator was entitled to have the net income of the Vermont Central and the Vermont & Canada Railroads set aside and appropriated to the payment of said rent in the first instance; that said court appointed receivers to operate said railroads, for the purpose of giving effect to its said decision; that the receivers so appointed never became liable directly to the Vermont & Canada Railroad Company for the discharge of their duty, and derived no power or authority from the said company, but only from the court; that the Vermont Central Railroad Company, having thus entered into an agreement with the Vermont & Canada Railroad Company, whereby its net income, as fast as it should come into existence, was pledged to the Vermont & Canada Railroad Company for the payment of rent pursuant to the said lease, the Vermont Central Railroad Company afterwards, on October 20, 1851, issued and sold or negotiated its bonds, called first-mortgage bonds, secured by a first mortgage of its railroad and all its property to trustees for the holders of said bonds to the amount of $2,000,000; that the Vermont Central Railroad Company thereafter, on May 28, 1852, issued its bonds, called second-mortgage bonds, and caused them to be duly secured by a second

mortgage of its road and all its property to trustees for the holders of said bonds to the amount of $1,500,000, and negotiated and sold the same to the amount of $1,200,000 or thereabouts; that said bonds of both classes went into the hands of *bona-fide* purchasers for value, and were still outstanding in the hands of said purchasers or their assigns; that the trustees in said first and second mortgage deeds, respectively, took thereby good and perfect mortgage title to the Vermont Central Railroad, subject only to the diversion of so much of the joint net income of the roads of both the lessor and lessee as should suffice to pay the rent becoming payable to the lessor for the use of its road; that before any default occurred in the payment of the rent to the Vermont & Canada Railroad Company, and soon after the issue of said second-mortgage bonds, viz. on June 28, 1852, the Vermont Central Railroad Company surrendered its road to the then trustees of said first-mortgage bonds, and at the same time transferred, assigned, and set over to them the lease of the Vermont & Canada Railroad and the benefit of the earnings or income thereof, whereupon said trustees came into possession of the income of the Vermont Central and the Vermont & Canada Railroads, and of the means of applying such income in keeping down said rent, and of preventing any default in the payment thereof; that by reason of such surrender of the Vermont Central Railroad, and transfer of the lease of the Vermont & Canada Railroad, the first-mortgage trustees became the trustees for the first-mortgage bondholders as to the income of said two railroads, subject to the payment therefrom of said rent; that that state of affairs continued until the appointment of receivers in the original cause, May 17, 1855, when said trustees were deprived of the possession of both of said railroads by order of the court, at the suit of the Vermont & Canada Railroad Company, and had ever since been so deprived; that the provisions of the decree of January 19, 1864, in relation to the net earnings in excess of said rent payments, were intended as a recognition and readjustment by the parties, with the sanction of the court, of the right of holders of first and second mortgage bonds to have and enjoy, according to their respective priorities, the income of said railroads in excess of said rent-payments; that at the time the compromise decree of 1864 was entered, the receivers were in fact the same persons who occupied the position of trustees under said first mortage, so that the duty of paying over the surplus income to the holders of said first mortgage bonds to the extent of their claim to the same, was the same duty that would have devolved upon them by reason of their office of trustees under said mortgage had no provision been made in said de-

cree respecting said surplus income; that the only surplus net income remaining subject to the order of the court or of the receivers after the decree of 1864, was such surplus fund derived from said net income as might remain the property of the Vermont Central Railroad Company after satisfying all sums due to the holders of said first and second-mortgage bonds as provided in the decree of 1864, and that so far as said net income of said railroads was applied and appropriated for the benefit of creditors of the Vermont Central Railroad Company by the decree of 1864, it was not competent for the court to disturb or change such appropriation, unless upon due proceedings had for that purpose after lawful notice to the various parties in interest, and that no such modification of said decree had ever taken place, and that the same was still in force and unchanged; that the petitionee, as the holder of bonds as aforesaid, by virtue of the contract contained in the second mortgage deed, of the deed of surrender of the Vermont Central Railroad to said first mortgage trustees, dated June 28, 1852, of the deed of assignment to them of the lease of the Vermont & Canada Railroad of the compromise agreement of 1863, and of the terms thereof as expressed or embodied in the decree of January 19, 1864, had, in common with other like bondholders, a valuable interest and property in the Vermont Central Railroad and in the Vermont & Canada Railroad, and the franchises thereof, and in the income derivable therefrom, and that neither of said railroads could be sold as prayed in the petition, without annulling or greatly impairing said contracts, or some of them, contrary to the provisions of the Constitution of the United States, Article I. s. 10; that the Vermont Central and the Vermont & Canada Railroads were built by their respective corporations under franchises granted by the Legislature for that purpose; that said railroad property and franchises were inalienable, except in pursuance of the provisions of the laws of the State relating to the mortgage or sale of such franchises, or by virtue of the agreement of the owners, made with the sanction of the Legislature; that there was no lawful authority for a judicial sale of any railroad in the State, on the application of parties claiming to hold a lien on its franchise not originating in any mortgage thereof, nor other contract entered into by such railroad corporation; that if such sale should be ordered, the Central Vermont Railroad Company was not by its charter authorized to become the purchaser at a forced sale, procured to be made by itself for the purpose of acquiring said railroads adversely and without the concurrence of the corporations owning the same.

As to so much of the petition as alleged that the Central Ver-

mont Railroad Company was a creditor of the trust to the amount of $500,000, the answer admitted that before the Central Vermont Railroad Company became receiver, it made a large loan to the receivers then in office, taking their notes as receivers therefor, with other notes or bonds of said receivers as collateral security, that said loan had never been paid and was still due, but denied that by reason thereof the Central Vermont Railroad Company was a creditor of either the Vermont Central Railroad Company or the Vermont & Canada Railroad Company, or that the Central Vermont Railroad Company had, or was entitled to have, a lien for said debt on any property belonging to either of said companies, save only such net income thereof as might remain at any time in the hands of said receivers after satisfying the prior claims thereon of the Vermont & Canada Railroad Company and the holders of first and second-mortgage bonds, as provided in the decree of 1864. The answer admitted that the Vermont Central and the Vermont & Canada Railroads had been in the hands of receivers appointed by the court for many years, not for the purpose of executing any trusts in favor of the Vermont & Canada Railroad Company and others, as in the petition alleged, but for the purpose of enabling the Vermont & Canada Railroad Company to obtain payment of said rent. The answer further alleged, that under the decree of July 13, 1861, the Vermont & Canada Railroad Company was the only beneficiary, and that the receivers under said decree had no duty or function as trustees, and no trust whatever to execute that placed said company in any relation of trust to said receivers, or that made the receivers accountable for the discharge of their official duty to any one but the court by which they were appointed ; that the Vermont & Canada Railroad Company had never since consented to nor done any act whereby the relation between itself and the receivers as established by the decree of 1861, had been changed, much less been converted into a trust for the management by said receivers of the Vermont & Canada Railroad. The answer admitted that said receivers had from time to time borrowed large sums of money, but denied that said sums had been borrowed for the purpose of the execution of the trust of the receivers as managers of said railroads as alleged, except so far as the loans of $700,000, $300,000, and $1,000,000, called the first, second, and third equipment loans, might have been made for the purpose of providing for equipment or supplies for the operation of said railroads ; and alleged that all the other loans made by said receivers, and specified in the petition, were made wholly or mostly for the purpose of funding the floating debts of the receivers, incur-

red in operations undertaken by them beyond the line and limits of the Vermont Central and the Vermont & Canada Railroads— operations that they as receivers had no lawful right to enter into, either with or without the permission of the court, and which debts were not chargeable against any property or income of said railroads, or either of them, and could not be lawfully enforced against either of said companies, or the property or income thereof. The answer further alleged that soon after the Vermont & Canada Railroad Company entered into the compromise agreement of 1863, the receivers resumed payment of the interest on the Vermont Central Railroad first-mortgage bonds, and were in the receipt of income from said railroads largely in excess of the amount required to pay the rent of the Vermont & Canada Railroad ; that at about the same time said Clark and Smith, two of said receivers, engaged individually in the building of a railroad known as the Montreal & Vermont Junction Railroad, and became the principal owners thereof when built, and thereafter so continued ; that in the construction of said road they used the funds of the receivership to a large amount, and have never replaced the same ; that they became indebted therefor as receivers to the parties from whom the same were obtained, and thereby created an indebtedness against the receivership for their own private benefit ; that at about the same time, to wit, in 1864 and 1865, said Clark and Smith employed the funds of the receivership to a very large amount in obtaining control of the Stanstead, Shefford & Chambly Railroad, being thereto induced by the advantage that would thereby accrue to the Montreal & Vermont Junction Railroad; that the control of the Stanstead, Shefford & Chambly Railroad was procured by them without any previous authority from the court ; and that the expenditure by said receivers from the income of said railroads on account of the acquisition of the Stanstead, Shefford & Chambly Railroad, amounted to upwards of $800,000, and that indebtedness had thus been incurred to the amount of $813,415.81 ; that said receivers, or their predecessors, had contracted in their own name and behalf, other debts and liabilities of large amounts, not arising from the operation by them of the Vermont Central and the Vermont & Canada Railroads, nor in the proper or legitimate discharge of the duties of their office as receivers in any way, as follows: By reason of losses prior to July 1, 1873, on the lease of the Ogdensburg & Lake Champlain Railroad, $408,691.95 ; on the lease of the Rutland Railroad, $831,786.18 ; on the lease of the Missisquoi Railroad, $113,173.29 ; on the lease of the Stanstead, Shefford & Chambly Railroad, $73,442.03 ; on the lease of the Northern Transporta-

66

tion Company, $689,843.12; and by reason of losses after that time, on the lease of the Ogdensburg Railroad, $450,000; on the lease of the Rutland Railroad, $550,000; on the lease of the Missisquoi Railroad, $125,000; on the lease of the Northern Transportation Company, $250,000; and in the purchase of 9,150 shares of Central Vermont Railroad stock, $496,000; resulting in a debt of $4,801,352.85, still outstanding in various forms against said receivers, which debt would not have existed in any form had the receivers confined themselves to the legitimate discharge of the duties and exercise of the powers conferred on them by the decree of July 13, 1861, as modified by the decree of January 19, 1864. The answer admitted, that the receivers, after having entered into the several contracts for operating outside railroads as alleged, applied to the court and obtained its sanction thereto, but alleged that the sanction so obtained operated to entitle the receivers to an allowance or credit in their accounts rendered in court of all sums disbursed or expended by them in the performance of said contracts, but not to create any enlargement of the receivership. The answer denied that the several debts of the receivers in the form of bonds or floating debt, described in the petition, except the $700,000 of bonds issued in 1865, were contracted under the direction of the court as alleged, but averred that, with said exception, all of said receivers' bonds were issued by leave of the court obtained by the receivers, to enable them to provide for existing indebtedness that they had contracted without any authority, and that the leave of the court was obtained in order to fund the debts that had been already created by said receivers, and not otherwise; denied that any debts were ever contracted by the receivers by the direction of the court, except the seven-hundred-thousand-dollar debt for equipment in 1865, and the debt of $457,500 in 1876; and denied that, except as aforesaid, the receivers were ever authorized to issue any notes or bonds whereby their existing indebtedness was to be enlarged or any existing lien or charge was intended to be superseded or disturbed in any way, or was in fact superseded or disturbed; denied that the debt contracted by the receivers and managers constituted a charge and first lien on the Vermont Central and the Vermont & Canada Railroads, or either of them, as alleged; averred that the only instance where the bonds of receivers authorized to be issued by the court were declared to constitute a lien on property of any kind, save equipment bonds, occurred in the decree of April 20, 1872, wherein it was provided that the notes issued thereunder should constitute a lien and charge on the trust property under the control of the trustees and mana-

gers and the earnings thereof; that that provision in said decree was not to be taken as inconsistent with the preservation of pre- viously existing liens and charges on the same property, but that if the court thereby intended to set aside and displace the liens upon said railroads or railroad income previously established and existing in favor of the Vermont & Canada Railroad Company and the holders of first and second mortgage bonds, respectively, that said provision of the decree was void, and invalid for such purpose. / The answer admitted that large outlays of money had been made by the receivers on the Vermont & Canada Railroad, and on equipment purchased to be used thereon, but alleged that the receivers had been reimbursed by the issue to them of the shares of stock of the Vermont & Canada Railroad Company for all expen- ditures by them made on said railroad, or nearly so; that of the debts created by them to the amount of $6,357,000, as specified in the petition, not more than $2,000,000 had been expended in the improvement of the Vermont Central Railroad, or the pur- chase of equipment therefor, and that the balance of the receiver- ship indebtedness had grown out of the operations of the receivers, undertaken outside of and beyond the line of the Vermont Cen- tral and the Vermont & Canada Railroads, and out of the losses thereby incurred, and had not arisen in the course of the manage- ment of the railroads in pursuance of the final orders or decrees of the court; that consequently neither said companies nor the par- ties interested therein as mortgage bondholders, should be subjected to loss by reason of the course pursued by the receivers in vio- lation of the duties imposed on them by said decrees, and that if the orders of the court claimed by the receivers to justify them in their proceedings were to be construed as extending' the scope of the receivership beyond the powers conferred by the final decrees of 1861 and 1864, then said orders were made without due notice, and after all issues involved in the suit had been finally determined, and were invalid and void. The answer denied that the credit of the former receivers and man- agers was destroyed by reason of malicious and wanton at- tacks in the public press and elsewhere, but averred that it was by reason of said extravagant and reckless operations and of the enormous losses thereby incurred; alleged that the receivers had voluntarily permitted said debt to be largely increased, when it was in their power to prevent it; that they continued to pay an exorbitant rent to the Rutland Railroad Company, or to become liable and indebted therefor, long after that company offered to receive back the possession of its railroad and to terminate the lease thereof; and that they declined to surrender the Ogdensburg

& Lake Champlain Railroad when permitted to do so ; that the only property belonging to the receivers or in their hands, subject to sale, consisted of the equipment and supplies purchased by the receivers, and of the personal property, materials, &c., in their possession ; and denied that the debt of the receivers attached in any way to the Vermont Central and the Vermont & Canada Railroads, or either of them, or that it had ever been adjudged to attach to said railroads, or either of them, or that if it ever did attach to them it would take precedence of the mortgage liens existing on the Vermont Central Railroad long before the creation of the receivers' debts, so as to justify a sale of said railroad without the consent of the holders of the mortgage bonds ; alleged that the charter of the Central Vermont Railroad Company was obtained by the receivers in possession of said railroads in 1872, three of said receivers being also the trustees under the first mortgage of the Vermont Central Railroad, and that one of their principal purposes in procuring said charter, was to enable the holders of the first and second mortgage bonds to become the proprietors of the capital stock of the Central Vermont Railroad Company by converting their bonds into the same in the manner in said charter prescribed, and thereby to own and control said railroad property, and to supersede the receivers as managers of said railroads ; that said charter was obtained in that way by the said receivers and trustees of the first mortgage bonds, for the benefit of the holders of the first and second mortgage bonds, and that they represented to said bondholders and others at the time, that they were acting in the interest of said bondholders, as well as of the holders of the indebtedness of the receivers and managers ; that having obtained the charter for the purposes aforesaid, and organized thereunder, the receivers and first mortgage trustees themselves became the chief corporators and officers of the Central Vermont Railroad Company, and did not admit the bondholders as such to become stockholders therein, nor open any books of subscription for that purpose, as they were required to do by the charter, though they were thereto requested by holders of said bonds ; that on the other hand, the Central Vermont Railroad Company, thus organized and officered, applied to the court by petition of June 2, 1873, asking the court that the receivership might be continued in force, and that the Central Vermont Railroad Company might be appointed receiver and manager in the place of J. Gregory Smith, Joseph Clark, W. C. Smith, Lawrence Barnes, and Benjamin P. Cheney, the former receivers and managers, who were joined as petitioners with the Central Vermont Railroad Company, and agreeing to assume and pay all the re-

ceivers' debts if so appointed, said Smith, Clark, and Smith being also first mortgage trustees, and joining in the petition as such, and said W. C. Smith also joining therein as the then sole surviving trustee under the second mortgage ; that the trustees of the first and second mortgages, in thus joining in said petition, should be deemed to have acted in that respect for the benefit of the holders of said first and second mortgage bonds, and not to their prejudice ; that the Central Vermont Railroad Company having thus succeeded to the receivership by order of court, should be deemed to hold and exercise the powers thereof with due notice of all prior equities in favor of the holders of said first and second mortgage bonds, and in subordination thereto ; that the lien conferred upon the Central Vermont Railroad Company as receiver and manager by order. of the court by which it was appointed, should be deemed to be, and to have been intended by the court to be, in subordination to liens previously existing in favor of bondholders as aforesaid, and not otherwise ; that under the circumstances aforesaid, it would be contrary to equity that the Central Vermont Railroad Company should be permitted to acquire or set up any demand against the Vermont Central Railroad Company, or the property thereof, in such manner as to enable it to contest the validity of said bonds or the security thereof, or to act in conflict with the rights of the holders of said bonds to enjoy the benefit of their mortgage security ; that the receivers, acting under the final decree of July 13, 1861, were the then trustees under the first mortgage of the Vermont Central Railroad; that they were made receivers originally because they were in possession of the Vermont Central Railroad and the earnings thereof prior to the commencement of the suit; that said trustees were instrumental in procuring the charter of the Central Vermont Railroad Company for the benefit of the holders of the first mortgage bonds, in part, as aforesaid ; that as such first mortgage trustees, they joined in the application to have the Central Vermont Railroad Company made receiver and manager in said suit; that J. Gregory Smith and W. C. Smith were, at the time the Central Vermont Railroad Company was made receiver, respectively, the president and vice-president of said corporation ; that J. Gregory Smith continued to be such president, and, with his associates, W. C. Smith and Joseph Clark, and Lansing Millis, an agent of said corporation and a shareholder therein, still was the holder or representative of a majority of the capital stock of the Central Vermont Railroad Company, and able to control said company according to his desire ; that the Central Vermont Railroad Company, in refusing to open

its books for subscription of stock as prescribed in its charter, and in electing to receive cash only in subscription for the shares of its capital stock, and in creating a large floating debt against the receivership by the purchase of 9,150 shares of its own capital stock, and giving the notes of the receivers in payment therefor, thereby increasing said receivers' debt by about $500,000, and in setting forth in the petition the inability of the receivers to pay the floating debt, and the necessity of selling the Central Vermont Railroad, free and clear of all incumbrances, for that purpose, all of which acts had been done, or were being done, through the agency of the same first-mortgage trustees and managers of the receivership, through the corporate organization employed by them for that purpose, was aiding and abetting the first-mortgage trustees in the performance of an act that, if it should result in bringing the Vermont Central Railroad to a forced sale, free and clear of said first mortgage, and against the will of the holders of the first-mortgage bonds, would amount to the perpetration of a gross fraud upon all of said bondholders ; that the original suit of the Vermont and Canada Railroad Company was still pending for the purpose of enforcing the rights of the orator therein under the decree of July 13, 1861, as modified by the lawful provisions of the decree of January 19, 1864 ; that the accounts of the receivers in said suit, since the year 1866, had never been passed and settled by the court ; that an accounting by said receivers down to July 1, 1873, was duly ordered by the court, and masters appointed for taking such account ; that the matter was still before the masters, and no report had been made ; that the accounts of said receivers between July 1, 1873, and the date of the filing of this petition, had not been taken nor passed by the court ; and that until such accounts had been taken and passed, it would not be known what was the just and lawful amount of the receivers' indebtedness, or of the assets of the receivership ; that if the receivership debt attached to the Vermont Central or the Vermont & Canada Railroads, or to either of them, to any extent, it could attach only after the precise amount thereof had been duly ascertained and fixed, and after all the assets in the hands of the receivers, including the Stanstead, Shefford & Chambly Railroad, had been disposed of, and applied in reduction of said debt ; that said suit could not be discontinued on the petition of strangers thereto, nor without the consent of the orator therein, and of other persons interested in the enforcement of the decrees of 1861 and 1864 ; that a supplemental bill in the original suit, in the nature of an original bill, was filed on or about September 30, 1876, by W. Tracy Eustis and others, holders of sec-

ond-mortgage bonds to a large amount, and that the same was still pending, returnable to the then next April Term; that the only ground on which the priority of the lien of the second mortgage on the property and franchise of the Vermont Central Railroad over the trust debt could be fairly questioned, was presented in the supplemental order or decree of the chancellor, entered January 19, 1864, and known as the compromise decree; that one portion of said decree purported to provide that the lien previously existing in favor of the Vermont & Canada Railroad Company on the income or earnings of said railroads, should be extended and enlarged so as to embrace the roads themselves, and the whole property thereof; that said provision was without support in law, except an allegation of the orators contained in the petition filed November 11, 1863, to the effect that such lien on the whole railroad and railroad property had been already adjudged and decreed in favor of the orator by the final decree of July 13, 1861; that said allegation was wholly false; and that the decree of January 19, 1864, was in that respect erroneous and void, and ought to be amended so as to conform to the decree of 1861. The answer submitted that it was not within the power of the court to order a sale of the franchise and property of the Vermont Central Railroad Company on the petition of the Central Vermont Railroad Company and others as creditors of the receivers and managers or as creditors of the Vermont Central Railroad Company without security on said railroad given by said corporation itself, and not within the authority of the court to confer on the Central Vermont Railroad Company the power of purchasing or acquiring the Vermont Central Railroad franchise and property in case it should be brought to a forced judicial sale on this petition; and that if the sale should be ordered, and the Central Vermont Railroad Company be permitted to become a purchaser, it should be subject to the rights of the holders of the second-mortgage bonds.

The answer of W. Tracy Eustis and Clement A. Walker, holders of second mortgage bonds to a large amount, admitted that the Central Vermont Railroad Company was receiver and manager in possession of the Vermont Central and the Vermont & Canada Railroads by appointment of the court in said cause, and that by virtue of such appointment it was acting or bound to act in pursuance of the final decree of July 13, 1861, and the modification thereof by the decree of January 19, 1864, so far as the provisions of the latter decree were made with the knowledge and consent of all the parties to said cause and were not inconsistent with nor materially different from the provisions of said final decree, but

objected to the claim of the Central Vermont Railroad Company to make all the proceedings in said cause a part of the petition, except so far as the proceedings subsequent to the final decree had been had in due form of law, and after due notice to all the parties to said suit, and especially after due notice to the trustees of the holders of the second mortgage bonds, and except so far as said proceedings had been had under and in strict conformity with the provisions of said final decree and within the scope of the bill in the original suit. The answer alleged that the peti- tionees did not know what was meant by the allegation in the petition that the Central Vermont Railroad Company was a creditor of the trust which it represented to a large amount, but that if it meant to allege that it was a creditor of the Vermont Central Railroad Company, or of the trustees under the second mortgage, or of any of the parties defendant in said original suit, they denied the allegation. The answer denied that the Vermont Central and the Vermont & Canada Railroads had been under the administra- tion of the court in said cause for fifteen years, or that the court had had or then had under its administration anything save the income of said roads, and the possession and management of the same so far as necessary to obtain the income thereof; and alleged that the only trust funds, if any, under the administration of the court in said suit originally consisted of the net earnings or income of said roads that remained after deducting the expenses of operating the same, keeping them in repair, and furnishing the necessary equipment and supplies for properly conducting the business thereof. The answer admitted that for the purpose of operating said railroads successfully and advantageously, and of paying debts lawfully incurred by them, the receivers in posses- sion had, with the permission of the court, borrowed at different times or issued their notes to the amount, in all, still outstanding, of $2,904,000, and no more, it being the three equipment loans of $2,000,000 in all, and the guaranteed loan of $904,000, and alleged that the receivers' trust-fund was thereby increased to a large amount by the receivers' own act. As to all other bonds issued by said receivers, or loans made by them, and referred to in the petition, the answer denied that they were issued within the line of duty or office devolved on said receivers by the court, and alleged that they were issued by said receivers, at different times, for their own private ends, and mainly to provide for losses made or debts contracted by them in operations undertaken by them of their own motion, beyond the line of said railroads, to the great disadvantage and injury thereof, and that as to debts of that de- scription it was immaterial, so far as the petitionees were con-

cerned, whether the sanction of the court was obtained thereto or not; that the Central Vermont Railroad Company, as receiver and manager, had recently incurred a debt of $457,500 and upwards in the purchase at par of shares of its own capital stock, and that if said debt attached by law to the trust-fund placed in its hands for administration for the benefit of the Vermont & Canada Railroad Company, and holders of first and second-mortgage bonds, then said purchase was a misuse by it of the trust-fund in its charge, and an abuse of its power over the same; and that so much, at least, of said alleged indebtedness of the receivership should be disallowed, or paid, if at all, by said receiver out of its own private funds; denied that said indebtedness of the receivers and managers, or any of it, constituted a charge and first lien on the Vermont Central and the Vermont & Canada Railroads, or either of them, and alleged that said second-mortgage bonds constituted a charge and lien on the Vermont Central Railroad, its franchise, and the specific property thereof described in said mortgage, prior in right of security to the indebtedness created by said receivers and managers, or any part thereof; that the receivership indebtedness could not be adjudged to be a lien on said road and property in said mortgage described, and as such entitled to priority over said mortgage creditors, and that the trustees under said mortgage could not be decreed to release said mortgage according to the prayer of the petition, without impairing the obligation of said mortgage contract, contrary to the provisions of the Constitution of the United States; denied that the orders or decrees of the court, made at the request of said receivers at any time, created or purported to create any lien or incumbrance on the property or estate of the Vermont Central Railroad Company, or that they purported to confer or establish any right of priority over liens previously existing on the property or earnings of said company, or to overthrow or set aside previously existing liens on any property whatsoever, or were intended to have that effect, or that they could have any such effect if they were so intended, except by the actual consent of all parties holding such prior liens or securities. The answer also alleged the filing of the supplemental bill mentioned in the answer of defendant Brooks, and that it should be heard and determined before any further proceedings were had on said petition.

The answer of Robert Codman and Henry A. Johnson, holders of guaranteed bonds, objected to the sale prayed for in the petition, unless it was guarded by proper conditions for the protection of the interests of the creditors of the trust, for that said roads and property were of such large value and of such peculiar char-

67

acter that it would be impossible to find competing purchasers thereof except at rates altogether less than the value thereof, and for that such a disposition of the property as prayed for would be a grievous hardship to the creditors of the trust who had advanced money to the managers under the sanction of the decrees of the court, and with the fair and reasonable expectation that their claims would be carefully guarded and protected by the court in requiring the trust property to be disposed of to the best advantage for their interests. The answer also alleged, that although the value of said railroads and trust property might be equal to the amount of the trust debts, yet, that in a forced sale thereof, without proper conditions and safeguards, the same would necessarily be sacrificed at an inadequate price; that in case of any sale of said roads or property, the rights and interests of the creditors of the trust should be fully protected, and that prior thereto the claims of all the creditors of the trust should be ascertained and liquidated as nearly as possible, and that thereupon said managers, or some other persons appointed therefor, should be required to offer said roads and property, under a suitable decree, at public auction, at an upset price representing the estimated aggregate of the trust debt, and in case there should be no bidder above such upset price, that then said roads and property should be sold, suitably transferred, and by proper instruments conveyed to a committee or trustees to be appointed by the court on nomination of the trust creditors, parties to this proceeding, for the benefit of all the creditors of the trust; that meantime, and until further disposition of the property should be agreed upon by the creditors of the trust, said roads and property should be held and managed by such committee for the benefit of the creditors of the trust, as managers under the direction of the court, or else that such sale should be conducted in some other manner, as to which the petitionees prayed for leave at some future time to make suggestions, so as fairly to protect the rights of the creditors of the trust. The answer further objected to so much of the prayer of the petition as required that the Vermont & Canada Railroad Company should release all its interests in case of a sale of the trust property, for the reason that the petitionees were creditors of said company by reason of that company's indorsement of the bonds of which the petitionees were holders. The answer also objected to the prayer of the petition that the Central Vermont Railroad Company might be permitted to become a bidder or purchaser of the whole or a part of said roads and property, not only on the general grounds of equity, but also because the petitionees were informed and believed and

were ready to prove that the Central Vermont Railroad Company, through its directors, had suggested and was seeking to accomplish a scheme to take said roads and property from the control of the court, by which the Central Vermont Railroad Company should retain, as a corporation, full control of said roads, compelling the creditors of the trust to exchange their securities for mortgage bonds on said roads of an issue greatly larger than the whole trust debt, and compelling them further, not only to a much lower rate of interest, but to an entire postponement of any interest on their claims for about three years, in order that the earnings of the property might be applied to the reduction and payment of said floating debt; and that said floating debt was principally held by the Central Vermont Railroad Company and its directors, or by other parties with the indorsement or guaranty of said company, or individually of its directors; and that in order to carry out said scheme, it was the purpose of said company to obtain leave of the court to purchase the trust property at a forced sale and at a nominal price, for the purpose aforesaid.

John M. Pinkerton and William G. Shaw, other holders of guaranteed bonds, adopted the answer of said Codman and Johnson.

Said Pinkerton and Reuben E. Demmon, holders of Stanstead, Shefford & Chambly bonds named in the petition, answering for themselves and all other holders of said class of bonds who desired to avail of this action, admitted that said bonds were issued as alleged in the petition, and secured by a pledge of certain stock and first mortgage bonds of the Stanstead, Shefford & Chambly Railroad, with a pledge also of the net earnings of said road, to pay, first, the accruing interest on said bonds, and after that, to constitute a sinking fund, with which to retire the principal when due, the receivers holding said collateral in trust for the owners of said bonds. The answer alleged that said issue of bonds was made originally to the holders of the first and second mortgage bonds of the Vermont Central as follows: To the holders of the first mortgage bonds, in payment of the interest coupons that fell due June 1 and December 1, 1867, on their bonds, and to the holders of the second mortgage bonds in payment of the first two maturing coupons on their bonds, upon condition that the holders of said second mortgage bonds should, in addition thereto, take Stanstead, Shefford & Chambly bonds to an amount equal to ten per cent. of the face value of the second mortgage bonds, and pay par therefor, in cash—the money thus received and derived from the cash payment of the second mortgage bondholders being appropriated by the receivers towards paying the stock and sterling

bonds of the Stanstead, Shefford & Chambly Railroad; that the petitionees were informed and believed that there were six hundred bonds of one hundred pounds sterling each of the Stanstead, Shefford & Chambly Railroad held by English owners, which were not purchased by said receivers, but that a written contract was entered into by said receivers with them, whereby said bonds were lodged by the owners thereof in some bank in Montreal, and by which said owners agreed to take five per cent. per annum on an amount equal to fifty per cent. of the par value of said bonds, with the right on the part of the receivers to buy said bonds at any time thereafter at the rate of fifty per cent. on their par value; and that said contract had ever been observed by the receivers according to the terms thereof, and that they were still bound thereby; that the receivers had always been in possession of said railroad since the purchase of said stock and sterling bonds, and had taken the net earnings thereof, and so had become chargeable with the same for the uses of the holders of the Stanstead, Shefford & Chambly bonds, as provided and set forth therein, and in the decree creating them; that the interest on said bonds had been regularly paid by the receivers until July 1, 1876, when the interest then due was defaulted, and had so continued; that the petitionees were ignorant whether said stock and sterling bonds were adequate security for said bonds still outstanding, and that they could neither admit nor deny the same; that the petitionees objected to the sale of the Vermont Central and the Vermont & Canada Railroads, unless such sale should be made subject to the payment of the principal and interest of the Stanstead, Shefford & Chambly bonds, or unless, in some other manner, a satisfactory arrangement could be made whereby the security of said bonds should not be impaired. The answer prayed the court to order the receivers to pay over to the holders of the Stanstead, Shefford & Chambly bonds the net earnings of the Stanstead, Shefford & Chambly Railroad pledged for that purpose, which had accumulated in their hands since the payment of the last coupon January 1, 1876, not exceeding the amount of interest that might have grown due, and the balance of said earnings, if any, to hold as a sinking fund, as provided in said bonds.

The answer of F. A. Brooks and E. D. Mandell, a majority of the committee of the holders of the first and second mortgage bonds, answering in their capacity as such committee, alleged that by virtue of the decree of January 19, 1864, said committee were the auditors of the accounts of receivers and managers in possession of the railroads of the priority respectively of the orator and defendant in the original suit, with power to approve the same when presented to the court by said receivers for allowance, so as

to entitle said accounts to be allowed and passed by the court without further proceedings, and with no other power in the premises as such committee, so far as they were advised and believed; that they were elected to serve on such committee on October 11, 1876; that they had not approved any accounts of the receivers as such committee since such election; and that it was their wish as such committee, that said accounts should not thereafter be passed and allowed by the court until they had been referred to masters for examination, according to the usual course of proceedings in chancery.

The answer of Worthington C. Smith, Estes Howe, and Joseph Converse, trustees of holders of second mortgage bonds, admitted the truth of the allegations of the petition, and favored the sale prayed for.

Judith W. Andrews, named as one of the defendants, moved to dismiss the petition, because the relief thereby sought could not be thus obtained, but only by original bill, if at all.

The answers were traversed and testimony taken. After argument, the chancellor held the case for advisement until June 11, 1877, when a decree was entered, dismissing the petition *pro forma* and without prejudice, that the questions involved might be heard by the Supreme Court on appeal. An appeal was accordingly taken by the petitioners, and came on for hearing at a special term of the Supreme Court convened for that purpose on July 24, 1877.

The case was argued by *L. P. Poland, Geo. F. Edmunds* and *B. F. Fifield* for the petitioners; *C. W. Willard* and *A. F. Walker* for the Vermont & Canada Railroad Company; *E. J. Phelps* for Mrs. Andrews and other first mortgage bondholders; *A. F. Brooks* for certain second mortgage bondholders; and *John Prout* for the Rutland Railroad Company,—all in opposition to the petition; and briefly by *Robert Codman* in favor of the petition, and *J. M. Pinkerton* in favor of the petition with modifications.

The case was held for consideration till the General Term at Montpelier, in October, 1877, when, on October 30, the opinion of the court was delivered by

BARRETT, J. It is proper to be said, that what I am now to read expresses the opinion of each of the judges constituting the

court by whom the case was heard as above shown, upon the fullest consideration that each has been able to give to the cause.

This cause has been pending in the Court of Chancery for Franklin County since the mandate of the Supreme Court of January, 1861. The purpose and scope of that mandate are expressed in it. It is now before this court by appeal from the *pro-forma* decree of said Court of Chancery, made at its last April Term. This is the first time since that mandate that the cause, or any question in it, has been before this court, or any other court in the State, except the Court of Chancery for Franklin County ; or before any judge, except in his office as Chancellor of the Court of Chancery for that county. The open statutes of the State creating our courts, and the open records of the court, have been free of access to everybody caring to know the truth of the matter, showing the fact to be as stated.

The petition which institutes the present case is by the Central Vermont Railroad Company, in the character of receiver and manager, and divers other parties having interests, personal and representative, in the subject-matter of said petition. Divers persons and corporations having interests in one relation and another to the subject-matter, are made defendants, some of whom have appeared and made answers.

The cause is before this court upon said petition and answers, with the records and documents, and the testimony adduced for the purpose of maintaining or opposing the petition. It is for the court to ascertain from what is thus before it, the truth of facts within the proper scope of said petition and answers, and to determine whether the law, predicable of those facts, warrants and requires the granting of the prayer of the petition in whole or in part. In ascertaining the truth of facts, we are bound to regard only what is legitimately before us bearing on that subject ; and in determining the effect of those facts as bearing on the prayer of the petition, we are to regard and consider and apply the law in its principles, rules, and usages. The case does not make the law. It is subject to the law, and is to be disposed of by force of the law as it exists and is applicable to it—not created nor varied by the case, but embracing and controlling it. The case is not

" a law unto itself," however important, voluminous, complicated, and unprecedented it may be ; but it is amenable to the law established and existing while the case has been growing into the substance, dimensions, and form with which it is now presented to the court.

In the discharge of present official duty, we are not at liberty to take into consideration statements, suggestions, or personal views and opinions of interested parties, either as to the facts or the law, only so far as they are presented in evidence or vouched upon reliable authority.

This is all, perhaps, that it behooves to say, having reference to what has come to us in various ways for years past in respect to the administration of the railroads embraced within this petition, and the relation that the courts and the various parties have sustained to it, whether prompted by the solicitudes of pecuniary interest, or by malevolent ignorance, or by mendacious malice.

It is pertinent to add, that the case is not before this court for the review or revision of questions touching the *judiciousness* of what has been done, either by the Court of Chancery or by persons and parties and interests that have had to do in making what now constitutes the history of these railroads since the mandate of the Supreme Court in January, 1861 ; nor for the review or revision of questions that might have been made, but were not, before that Court of Chancery, touching the legality of various things which the records before us show to have been done, constituting in large measure that history, now culminating in the present petition.   What is thus shown to have been done is for present consideration only as it bears upon the subject-matter of the petition, and characterizes the legal quality of the case presented by the petition.

The petition asks for the sale of both roads and the equipments thereof, free and clear of all incumbrances, and that the two railroad companies and the trustees of the 1st and 2d Vermont Central mortgage bondholders shall release to the purchaser the respective interests of themselves and of their *cestuis que trust* in said roads.   The ground and reason for this asking, as alleged to be, is, that the Central Vermont Railroad Company is receiver and

manager of the two roads, acting as such under the orders and direction of the Court of Chancery in the original cause; that various specified debts to a large amount have been contracted by said manager, by direction of the court, in the administration of said property; that said debts constitute a charge and first lien upon both of said railroads, and all the property and assets pertaining to the receivership; that the only means for raising money to pay said debts is a sale of the trust property under the management of the manager.

The petition is brought on the assumption that the Central Vermont Company is receiver and manager in succession to the persons who had, prior to that company, had the charge and immediate management in the administration of the property, and that those persons were also receivers and managers continuously from the decree of 1861, made pursuant to the mandate of the Supreme Court as the result of the decision of that court in January, 1861; so that the control and management has been that of a continuous receivership in pursuance of that mandate, continued and carried forward in administration by subsequent original and supplementary decrees and orders of the Court of Chancery; in other words, that the receivership of the Central Vermont Company and of its predecessors is of the same legal quality as, and a continuation of, the receivership contemplated by the mandate of the Supreme Court, and originally created and put on foot and operating by the original decree and orders of the Court of Chancery, conformably to that mandate, prior and down to the decree called the compromise decree of 1864,—and that the existing debts have been incurred in the legitimate administration of the property by the Court of Chancery, through the receivers who have had the roads and property in hand since the mandate and decree of 1861.

The petition is opposed by parties having various relations to and interests in the subject-matter, upon various grounds and reasons—some peculiar to the particular and peculiar relations and interests of the party—some common to all parties.

By the answers and contentions to the petition, the central-hinge question to be decided is, whether, upon the facts constitut-

ing the case before this court, the law warrants and requires the granting of the petition.

In August, 1849, the Vermont & Canada Railroad Company leased to the Vermont Central Railroad Company its road as then or thereafter located, with all the property then or thereafter belonging thereto, with the right and privilege of using said road and property, and permitting others to use the same, as fully and freely as said company might do under its charter and future additions thereto, to have and to hold unto said Vermont Central Railroad Company, their successors and assigns forever ; and, in the instrument of lease, agreed to continue and preserve the legal organization of the Vermont & Canada Railroad Company, and do all acts necessary and proper to carry into full effect the objects and provisions of the lease, — and gave irrevocable power and authority to the Vermont Central Railroad Company to use the name of the Vermont & Canada Railroad Company, to do everything that the Vermont & Canada Railroad Company might lawfully do, — the Vermont Central Railroad Company to pay as rent, in addition to the necessary incidental expenses of the Vermont & Canada Company, eight per cent. on the cost of said road, its buildings, fixtures, lands, and appurtenances, as the same shall have been paid by the Vermont & Canada Railroad Company, — the Vermont & Canada Railroad Company agreeing that it will at no time act, or interfere in the use or management of its road, or any of its appurtenances, except in the manner mentioned in the lease, or unless it shall be required to do so by law, or by the written request of the other party.

In 1850 an addition was made to the lease, providing that, in default and four months arrear in payment of rents, the Vermont & Canada Railroad Company might take the possession of both roads and all the property of both, and run them till, out of the net income, the accrued rent should be paid ; and then possession to be surrendered to, and resumed by, the other party, and held and used under the original lease,—and declaring that this provision should not prevent the Vermont & Canada Railroad Company from an action at law to recover any rent in arrear if it should choose to do so.

68

It was also agreed in said addition to the lease, that when the road should be finished according to the provisions of the lease, the Vermont & Canada Company was to have no further right to expend money on the road ; but the Vermont Central Railroad Company had the right to spend.as much as was found necessary in improving and perfecting. the road, buildings, and other fixtures,—all to be at its expense, and not to be charged to the Vermont & Canada Railroad Company.

It was further agreed, that if it should be necessary for the Vermont & Canada Railroad Company under its charter to extend its road to the village of Burlington, or to any other points, the Vermont Central Railroad Company was to have the additions under the lease, and to pay rent at the same rate, and in the same manner, and with like remedies, as stipulated for the rest of the road.

The first mortgage of the Vermont Central Railroad Company, dated October 18, 1851, and the second mortgage, dated May 20, 1852, were made expressly subject to the rights of the Vermont & Canada Railroad Company under said lease. On the 28th of June, 1852, the Vermont Central Railroad Company surrendered to the first mortgage trustees, and on the 12th of May, 1854, executed an additional instrument of surrender. On the 21st of June, 1854, that company surrendered to the second mortgage trustees, subject to the rights of the Vermont & Canada Railroad Company under the lease, and to the rights of the mortgagees under the first mortgage and said deeds of surrender. Possession was taken under said first mortgage upon said first surrender, and since that the Vermont Central Railroad Company has had no other possession. The last payment of rent under the lease was the 1st of June, 1854. The Vermont & Canada Railroad Company filed a bill in the Court of Chancery, June Term, 1855, in Franklin County, against the Vermont Central Railroad Company and the trustees under both of said mortgages, and several holders of bonds under said mortgages. The Vermont Central Railroad Company, the trustees under the mortgages, and one of the first mortgage bondholders, answered. The litigation proceeded in due course, resulting in the mandate of the Supreme Court in

January, 1861, and the decree in pursuance thereof of the Court of Chancery, as of the April Term, 1861, when receivers were appointed by that court pursuant to said mandate.

As shown by that mandate, the Supreme Court decided the original lease to be valid and binding between the parties to it, and upon all the parties to said cause, and that the addition of July 9th, 1850, was a valid and binding contract between the parties to it and all other parties holding subsequent incumbrances upon the Vermont Central Railroad, its buildings, fixtures, lands, and equipments, so far as to entitle the Vermont & Canada Railroad Company to have the tolls and income of said roads directed and applied to the payment of the rents due and growing due under said lease.

The mandate directs the Court of Chancery to cause the accounts of the then existing receivers to be settled and adjusted, and the amount of income in hand to be ascertained and applied in payment of rent then due, and of the orator's costs in the suit; and if not sufficient wholly to satisfy said sums, " Said Court of Chancery shall cause the receivers now in possession, or such as said court may see ·fit to appoint, to continue in the possession and management of said roads and other property used in connection therewith, and receive the tolls and income thereof, and from time to time, as the same shall be accumulated, cause the same to be paid over in extinguishment of said rents now due, or that shall have become due to the orators, until the same shall be fully satisfied.  The said Court of Chancery will make such orders relative to the time and mode of accounting by said receivers and of making payments to the orators as said court shall deem most convenient and satisfactory; and said receivers are to be under the general control and direction of said court at all times, according to the general practice of the Court of Chancery."

The cause was remanded by the Supreme Court, with said mandate, to the Court of Chancery, and the decree of that court, in pursuance of that mandate, was drawn up and recorded, in which it is said : " And in further accordance with the mandate of said Supreme Court in the premises, it is further ordered and decreed, that the possession, management, and control of both said rail-

roads and railroad property be continued in the present receivers, Lawrence Brainerd, Joseph Clark, and John Gregory Smith, subject to the order and direction of the court, with power of removal at all times."

The decree then orders as to accountings and reports by the receivers, and that they " pay over to said Vermont & Canada Railroad Company semi-annually, on the 1st days of December and June, such sums as may accrue from the earnings of said roads and property, until the sums now due and growing due to said company under said contracts, and the costs of this cause, shall be fully paid and satisfied." " And it is further ordered and decreed that said receivers, and said roads and property, shall be at all times subject to the jurisdiction and orders of this court."

Under that mandate and decree the receivership went on in administering the property for the purpose designated, down to the compromise decree of January 19th, 1864.

The compromise decree was preceded by a petition to the court by the Vermont & Canada Railroad Company against the defendants, or some of them, in the original suit of 1855, asking that a decree, supplementary to that of 1861, might be made, to carry into effect an agreement made on the 4th of June, 1863, by a committee of managers of the Vermont & Canada Railroad Company and a committee or agents of a very large proportion of the first mortgage bondholders,—which agreement recites that it was made " for the purpose of settling in full all claims and demands of the Vermont & Canada Railroad Company against the Vermont Central Railroad Company, and for the purpose of closing finally the construction account of the Vermont & Canada Railroad Company in the manner " provided in the agreement.

On the 4th of November, 1863, an act of the Legislature was passed and approved, with a preamble stating that a large debt was due the Vermont & Canada Railroad Company from the Vermont Central Railroad Company for rents under the lease, and that the Vermont Central Railroad Company and their bondholders were desirous that such rent should be converted into stock, subject to the terms and conditions of said lease, and of the con-

tract of adjustment and settlement of all differences, made by and between the holders of the first mortgage bonds and the Vermont & Canada Railroad Company. The act authorized the Vermont & Canada Railroad Company " to convert said *back rent* into stock, and to increase their capital stock for that purpose, on such terms and conditions as the Court of Chancery (in the pending cause) shall deem just and equitable, for the purpose of carrying into effect said adjustment." It provides that " proceedings may be had under the powers and authority conferred by this act before said court by petition in said cause, brought by any party thereto, upon such notice to all persons interested as the chancellor shall think reasonable and direct, and said court may proceed to hear and determine upon said petition without the dilatory and formal proceedings used in cases of bills and other pleadings in equity."

The petition avers, " that the carrying of said agreement into effect will be advantageous to all persons interested in said company's road and property and income." The petition was dated and sworn to on the 11th of November, 1863, and it prayed " that this court will, pursuant to said act of the General Assembly, cause reasonable notice," &c. It was signed by the Vermont & Canada Railroad Company by L. B. Peck and George F. Edmunds, its solicitors, and verified by the oath of Mr. Peck. Thirty days notice was ordered by personal service on some, and by publication to the parties named, and to " all others whom it may concern," for a hearing on the 19th day of January, 1864, and notice was given accordingly.

The record sets forth, that the parties named, and some other persons, appeared, " and making no objection to the granting of the prayer of the petition, and it being made to appear to the court here that the matters stated in said petition are true, and that the carrying the adjustment set forth in said petition into effect will be just and equitable to all parties interested in said roads and property : It is now, thereupon, the *premises considered*, ordered, adjudged, and decreed," &c., as set forth in the decree.

It is to be noticed that the professed purpose of the proceeding

then in hand, and of the decree then made, was, " the carrying the adjustment set forth in the petition into effect."

To that end, the decree authorizes the Vermont & Canada Railroad Company to increase its capital stock to two millions of dollars, which is to " be the basis for the computation of the rents provided for in the original lease "—except as further provided in said decree—" chargeable upon the whole property and income of both roads as a first lien thereon, to be paid by the trustees and receivers from time to time in possession of said roads and property, and from the income thereof, so far as the same can be earned, in semi-annual installments of equal amounts, payable on the 1st of June and December in each year, continually, beginning on the 1st day of June, 1864."

The decree then provides, that all incidental expenses accrued after June 1st, 1863, or thereafter to accrue, should " be paid from time to time out of the earnings and income of said roads and property "; that within three years from June 1st, 1864, the trustees and receivers should pay out of the earnings and income, (and as soon as it could be paid without delaying the extension to Highgate, as provided,) $97,000 in money, with interest from June 1, 1864, for the holders of said $2,000,000 of stock.

It then provides, " that said Vermont & Canada Railroad Company shall have no right to demand or receive, and shall not demand or receive, any further or other sum for, or on account of, any interest or rents in the premises now due or outstanding in its favor prior to said 1st day of June, 1864 ; nor for or on account of any incidental expenses existing prior to said 1st day of June, 1863."

It then provides that the costs and expenses of the extension to Highgate should " be paid by the trustees and receivers from the earnings and income of said roads and property ; " that, for not exceeding $250,000 of such costs and expenses, the Vermont & Canada Railroad Company should issue stock beyond and above said $2,000,000 of stock, and deliver the same to the trustees and receivers, for the benefit of the first mortgage bondholders, ratably, in part liquidation of their claims as such, and sell for cash, for the benefit of the bondholders, what, after six months,

had not been received by said bondholders,—such stock to draw the same rent as said two millions; that for the expense of building or completing any other part of the line necessary under the law then or' thereafter to be built or completed, further shares of stock should be issued to the same effect as the last issue.

The decree then provides, that after paying all that was provided for in the foregoing parts, " and after paying the necessary expenses of running, keeping in repair and managing said roads and property, the net income thereof" should be paid out and applied by said trustees and receivers, first, towards and for the payment in full of all sums due upon the first mortgage bonds; and then for payment in full of principal and interest due upon all the second mortgage bonds of the Vermont Central Railroad Company, and all remaining surplus to be paid to the Vermont Central Railroad Company.

It then provides that a then existing committee of first mortgage bondholders, and their successors, who should be appointed annually by such bondholders, should " constitute an advisory board in respect of the management of said roads and property, with the right to advise the trustees and receivers in respect thereto, and with the right' at all times to examine and inspect the books, papers, and accounts of said trustees and receivers in respect of the premises," said trustees and receivers to give the committee all the information in their power respecting their plans and policy in the management of the business of said roads. And that committee was to be the auditor of the accounts of the trustees and receivers, said accounts to be reported annually to the court, and if approved by said auditors, " they may be allowed and passed without further proceedings ; " but if any part should not be approved, the same to be referred for examination and decision according to the course of the court; that annually the trustees and managers should print and distribute to the first mortgage bondholders, " a report of the earnings and expenditures of said business, with a statement of its affairs and prospects in general, for the year preceding such report."

Item 13 of the decree is, " That all suits respecting said roads and property (except one for foreclosure of the first mortgage,)

depending either against said Vermont & Canada Railroad Company
or said trustees and receivers, shall be forthwith discontinued, and
the costs and expenses of all parties in said suits shall be paid by
said trustees and receivers out of the said income of said business;
and, in like manner, the reasonable charges and expenses of the
committee of first mortgage bondholders, in respect to the said
business, shall be paid from said income; and for the future ser-
vices and expenses of the advisory committee aforesaid, a reason-
able allowance shall be made and paid from said income. And
all claims and demands between the parties hereto, not herein
otherwise provided for, shall be waived and abandoned, and no
further claim or proceeding shall be made or had in respect
thereto."

It provides, lastly, that the cause in which that petition was
filed should be continued on the docket of said Court of Chancery,
and any party in the cause might " apply to the court from time
to time for further orders in the premises, as he may be advised ; "
and that " the reasonable costs and expenses of the proceedings
upon said petition, and in said cause, shall be paid out of said
trust funds."

The mandate and original decree on the one hand, and the
compromise decree on the other, have thus been brought together
in their substance, in order to render it easy to be seen that the
former decree, in answering to the mandate, was made in an *ad-
versary* suit, for the sole purpose of establishing the right of the
orators to their rent, in priority to all other rights and interests,
and to provide for satisfying that right in virtue of the legal effect
of the contracts of lease, in answer to the bill in its scope and
prayer, as encountered by the answers and proofs in the final liti-
gation; and that the receivership created by that decree looked
solely to realizing income from the use of the roads and property,
of which the receivers were to have the possession, control and
management, subject to the orders and jurisdiction of the court,
with which to pay the rent due and growing due. It is thus, also,
easy to be seen that the two railroads and the railroad property
were put into " the possession, management and control " of the
persons appointed receivers, and that their office as such embraced

Vermont & Canada R. R. Co. v. Vermont Central R. R. Co. et als.

the roads and railroad property as fully and effectually as it did the income realized from the use of said roads and property. It is.thus, also, easy to be seen that the mandate and decree did not contemplate that the railroads and railroad property should, under and by virtue of that receivership, be appropriated, by sale or otherwise, to the payment of the rent due to the orators; but that only the *income* of the use of the roads and property should be thus appropriated, whatever might be held to be the right of the Vermont & Canada Railroad Company in the last resort under the lease, in a case and proceeding properly adapted to ascertain such right; and by looking into the original bill it may be seen that the Vermont & Canada Railroad Company claimed to have, under the lease, only the right of possession and use of the property, viz., the two railroads and the railroad property, for the purpose of realizing payment of overdue rent by the income of such use, and that in the prayer of their bill, after asking for the possession for that purpose, there follows, " Or else, if it should not seem fit to the court to make such order, then that this court appoint some suitable and responsible person or persons to be the receiver or receivers and the manager or managers of the said Vermont & Canada and Vermont Central Railroads, and of all the real and personal property now in the hands of * * * the trustees as aforesaid, and used by them in running, working and repairing said road, and in the execution of their said trust, to run, work and repair said railroads, and to receive the earnings, and make all needful repairs, and manage all the business of said roads, and to pay out of said earnings for all needful expenses, and to do all other things proper and necessary to be done in carrying on and managing the business of the roads, and subject to such orders, directions, conditions, limitations and terms as to this court should seem proper and necessary to secure the rights of the orators, and of all other persons interested in the same." This seems decisively to indicate that the receivership asked for was to be, primarily, of the two railroads and the railroad property, and, as the result thereof, to become, by the use of said railroads and property, a receivership of the earnings for the purpose of being appropriated to the purposes designated.

From the substance of said two decrees thus presented, it is easy to be seen that the decree of January 19th, 1864, was a decree by consent—the result of a deliberate agreement of the parties thereto—extending to the obtaining for it the name and assumption of being a decree in the original cause, and to be signed as such by a chancellor, embracing, in the main, matters not within the scope of the bill, and not at all contemplated by the mandate of the Supreme Court and the decree made upon it, and embracing matters not within the province of the court to make the subject of decree under the original, or any other, bill predicated upon the relation of the parties in interest under the lease, and the 1st and 2d mortgages, at the time said decree was made. Neither the bill, nor the court upon said bill, had anything to do with funding the unpaid rent into Vermont & Canada new stock, to draw 8 per cent. interest annually, under the name of rent, to be paid out of the earnings of said roads and property ;—nor with the appropriation of the earnings of the roads in the hands and management of the receivers to the making of additional road in the line of the Vermont & Canada Railroad Company, and issuing thereupon $250,000 of new stock for the benefit of the 1st mortgage bondholders, to draw 8 per cent. annually ;—nor with the payment of anything to the Vermont Central Railroad Company or to its mortgage bondholders, that was to be realized by the use and running of the roads by receivers ;—nor with the disposition, and the costs and expenses, of other pending suits ;—nor with an advisory committee of 1st mortgage bondholders, and the paying of their expenses, and for their future services, out of the income made by the receivers ;—nor with the paying of the rent thereafter currently to accrue to the Vermont & Canada Railroad Company, and not so in arrear as to entitle the court to order the income to be realized and paid by receivers ;—nor with the decreeing as in the 4th item of said decree, " that rent shall be paid to said Vermont & Canada Railroad Company upon said $2,000,000, *chargeable upon the whole property* and income of said roads, as a first lien thereon."

It is to be noticed, however, that the Vermont & Canada Railroad Company in their answers to this petition, do not assert any

claim under this provision of the decree, except of right to the net earnings and income.

That compromise decree was made upon as ample notice "*to all concerned*" as was practicable, and such as was provided for in the special act in that behalf, and was, with all the preliminary proceedings, in the files and records of the court, open to all concerned, and so has remained ever since. The administration thereafter proceeded under and in pursuance of that decree, and the things provided by it to be done were done, and under that and subsequent decrees and orders, rents were paid to all entitled ; interest was paid to and received by mortgage bondholders under both mortgages ; substitutions of one form of claim for others were made, down to 1872, with no exception, disclaimer, or protest against said compromise decree.

The records now before this court show, that at the April Term, 1866, of the Court of Chancery for Franklin County, a bill was filed in the name of the trustees of both the Vermont Central Railroad Company mortgages, and of Otis Drury, a bondholder under the first mortgage, and of William Auspach, a bondholder under the second mortgage, against the Vermont & Canada Railroad Company and the Vermont Central Railroad Company, and twenty-six persons, by names familiar to that period of railroad history, and in some way related to the original and the compromise decrees, setting forth various matters in the nature of a supplement to said prior proceedings, and " that in the execution of the compromise decree in respect to the rights of the said two classes of mortgage bondholders respectively, and between each other, grave doubts and grave practical difficulties had arisen and did still exist," etc., " and that said trustees and committees of the two classes of bondholders, in view of the premises, and for the equitable and fair adjustment of said doubts and difficulties, and of the respective rights of said two classes of bondholders, and as between each other under the administration of said trusts and property by the court through its receivers, agree and provide, subject to the approval of the court, as follows ":—providing in detail how, what was to go from the receivers under the compromise decree to the bondholders under the mortgages, should

be handled and appropriated. The record shows that all the defendants were duly cited to appear and answer to said bill, and that none of them appeared; and thereupon the bill was taken as confessed, and a decree was drawn up as of April 14, 1866, which was signed by a chancellor. In item 9 of the decree it is provided: " In all the arrangements, acts, and provisions aforesaid, the prior and paramount rights of the Vermont & Canada Railroad Company, as provided in its lease and the instruments in addition thereto, and in the decrees of the Court of Chancery heretofore rendered in the cause, shall be recognized and preserved inviolate," &c., &c.; "and the decrees on 19th January, 1864, are ratified and confirmed, save and except so far as is herein otherwise provided as between said 1st and 2d mortgage bondholders."

In the 11th item it is provided, that the advisory board, provided for in said compromise decree, should thereafter be constituted of two 1st mortgage bondholders and one 2d mortgage bondholder.

Item 13 is to the effect that all the parties thereto, by representation or otherwise, and their privies, should be bound by and perform said decree, the same as if parties to the record.

Item 14. " The orators' costs in this supplemental proceeding shall be paid out of the trust funds in this court, in the hands of the receivers, and the same are taxed and allowed at $109.63."

It is easy to be seen that the orators in the original bill, viz., the Vermont & Canada Railroad Company, had no interest in the matter of said decree—were in no way party to the agreement,—and what was accorded to them by the original and the compromise decrees was in no way affected,—and that said proceeding and decree had no legitimate relation to the original decree,—and no relation to the subject, except by reason of the compromise decree. It was altogether and exclusively a matter between the 1st and 2d mortgage bondholders, and was beyond the scope of the original bill and decree, and was within the cognizance of the court only by consent and agreement to the decree of 1864, and to the decree of 1866.

It is easy to be seen that the whole proceeding was matter of agreement by parties having interests under the 1st and 2d mort-

gage bonds—assented to by the Vermont & Canada Railroad Company and the Vermont Central Railroad Company, and by the others who were made defendants in the bill.

That proceeding and decree have been in the files and records of the court—open to everybody—and the administration has gone on, and the fruits appropriated and received in pursuance of said decree, without exception, disclaimer, or protest against said proceedings and decree. The records of the 1st mortgage bondholders show how the matter was put on foot, resulting in the agreement of the various parties, who agreed that their agreement should be crowned by a decree of the chancellor; and hence the decree of April 14, 1866.

The petition of the receivers, dated August 4, 1865, and filed the 10th, for the first equipment loan, was set for hearing the 31st of August, and notice thereof was ordered to be given to each member of the committee of 1st mortgage bondholders, to the trustees of the 2d mortgage, and to the committee of 2d mortgage bondholders. The record shows that the order was complied with; and that the persons who, as receivers, brought the petition accepted service—presumably in their character of 1st mortgage trustees (though the record is silent as to that)—and the hearing was ordered to stand over to September 7th. It shows that the Vermont & Canada Railroad Company " appeared by L. B. Peck, its solicitor, and by a majority of its directors,—the Vermont Central Railroad Company by George F. Edmunds, its solicitor,— Joseph Andrews, J. M. Pinkerton and W. C. Smith appeared in person, and Robert Taylor and others by a writing from E. J. Phelps, their solicitor, informed the court that they do not object to the granting of the prayer of the petition; and said receivers appeared in person and by their solicitor; and proofs were heard *in support* of said petition, and counsel were heard thereon, and upon due consideration it was made manifest to the court that the matters stated in the petition were true; and thereupon it was ordered and directed that the receivers be authorized and empowered to borrow $700,000, and give 10 years' notes on 8 per cent. interest, free from the income tax, " and specially to pledge and secure a lien upon " equipments and car service as specified,—

said car service to be used to pay the interest and principal, and in default of payment, the holders of the notes to be at liberty to apply to the court, in the cause, for enforcement of the securities."

From what is thus shown it is apparent that said proceeding and decree was by agreement and consent of all the parties and persons named, acting *virtute officii*, as well as in personal right and interests. The money was raised upon the securities as provided, and was expended by the receivers for the purposes named in the petition, in their administration of the property under the compromise decree, supplemented by the decree of the following April, already spoken of.

Nothing in the case before us indicates that any party, person, or interest has excepted, disclaimed, or protested against said proceeding and decree ; and all interests have participated in the fruits thereof.

The petition on which the decree of May 1, 1867, was made, states that the petitioners " *have had a meeting with the authorized representatives, agents, and committees of all the different interests in said trust property, and have mutually agreed upon a plan* " for meeting liabilities as named in the petition ; and the record shows that the decree embodied and provided for carrying into effect that agreement, — due notice having been given to all the parties named, and by publication in the Boston *Daily Advertiser*, and in Walton's *Daily Journal*, of Montpelier, Vt. The decree provides for increasing Vermont & Canada stock $250,000, and how it shall be disposed of, viz., to pay in full the $97,000 of rent due and not paid when the compromise decree went into operation, which was " to be in full for all expenses and payments for construction and erections upon and for said Vermont & Canada Railroad up to that time." It provides a variety of detail as to particulars of mode and effect, not within the province of the chancellor, except by virtue of the agreement of the parties.

The record states that, " it was also proved that at a duly notified meeting of the stockholders of the Vermont & Canada Company, it was voted by said stockholders that the stock of said company be increased the sum of $250,000, in shares of $100

each." It was further decreed that the receivers and managers be authorized to issue their notes for $500,000 on 7 per cent., payable in twenty years, to be secured by the S. S. & C. stock, " and all the mortgage bonds of said company, now held by said managers and receivers, and by all the net earnings of said road to be run by them." With these notes the receivers were directed to pay the installments of interest to fall due on the first and second mortgage bonds, " *and it is ordered that the same be accepted and received by such bondholders in full payment and discharge of said installments of interest on their respective bonds.*" The agreement of the second mortgage bondholders to pay in money for $150,000 of said notes, " is confirmed *and decreed to be performed.*" That money, " and the remainder of said notes in the hands of the managers, are to be applied by them to the extinguishment of liabilities against said trust."

The receivers and managers were authorized to issue and dispose of their promissory notes for $300,000 on 8 per cent. for ten years, free from the income tax, to be secured by a lien upon all the engines and cars covered by, and subject to, the first equipment loan, and upon certain specified equipments and car service not embraced in the former loan ; the avails of said notes to be applied in extinguishment of the liabilities against said trust. Said petition, proceedings, and decree have been in the open files and records of the clerk of the court of Franklin County, for the free inspection of all interested persons and parties. The provisions of the decree were carried into effect, and all interests in the railroads and their administration partook of the fruits, without exception, disclaimer, or protest thereto, until the 18th day of May, 1868, when Clark, Brainerd, Smith, Cheney, and Taylor, " the board of management," under a decree of August 16, 1867, petitioned the court for a modification of said decrees for the first and second equipment loans, representing that doubts had arisen as to the proper construction of the decrees, and controversy was likely to arise in respect thereto, to end all which and for further purposes the petition states that on the 30th of April, 1868, a meeting was held in Boston, and articles of agreement were entered into between several committees of bondholders and parties

who had subscribed the same, setting forth the same, and praying that the same might be ratified and confirmed. Notice pursuant to order was given of the hearing to be had on the 22d of May, and the parties to said agreement, and the two railroad companies appeared by officers, and solicitors appeared, and no objection was made " to the prayer of said petition." Whereupon said articles of agreement were ratified and confirmed. The open record shows this proceeding and decree, and under it the administration went on in the interest, for better or worse, of all concerned, without exception, disclaimer, or protest.

For the present, the decree of August 16, 1867, is passed without remark, it being that in which Brainerd and Clark resigned as receivers, and Cheney and Taylor were appointed in their place ; and then Smith, Cheney, and Taylor, as " receivers and managers," and said Brainerd, Clark, and Smith, were constituted " a board of management (any three of whom should be a quorum), with power and authority, subject to the further orders and directions of said court, *to make all needful rules, orders, and regulations for the management and operation of said roads and property and business,* and to run, manage, and operate the same for the uses and purposes, and under the decrees, orders, and limitations heretofore made in this cause, except as herein modified." And Cheney and Taylor were " authorized and directed to immediately assume, according to the provisions aforesaid, the joint possession and management of said roads, property, and business, as such receivers and managers as aforesaid, with the said Brainerd, Clark, and Smith, holding as aforesaid."

The third equipment loan was in conformity to a decree of April 13, 1869, on a petition filed the second Tuesday of April, 1869, by Brainerd, Clark, Smith, Taylor, and Cheney, as " trustees and managers," setting forth *greatly increased* and *constantly increasing* expenditures, resulting in " a very considerable debt now due from the trust," and " that it is expected that the business of said roads must be largely increased, and the trust property greatly benefited ;" to meet which " increase of business, new and additional equipment must be immediately made to the roads ;" and setting forth that the petitioners had recently con-

SPECIAL TERM, JULY, 1877. 553

Vermont & Canada R. R. Co. v. Vermont Central R. R. Co. et als.

sulted with the directors of the Vermont and Canada Railroad Company, and the committee of the first and second mortgage bondholders, and with many other persons largely interested in said trust, and that " all concur *in thinking that the petitioners should be authorized by the court* to borrow money to pay said indebtedness and procure additional equipments," etc.; and that there then was a large amount of equipments on the roads not covered by former equipment loans, and praying for the advice of the court in the premises, and for an order authorizing the borrowing of the proposed money.

The record recites that the petition was verified by the oath of Smith, Cheney, and Taylor. It does not show any order of notice or notice given ; but states that, on hearing, it appeared that the directors of the Vermont & Canada Railroad Company, on the 9th of April, 1869, voted to assent to a further issue of equipment bonds, not exceeding $1,000,000 ; that the committee of 1st and 2d mortgage bondholders appeared by Pinkerton, their solicitor, and made no objection to the prayer of the petition; that Dullis, Stanton, Stevens, and Converse, persons largely interested in the trust property, appeared by their solicitor, and made no objection; that the Vermont & Canada Railroad Company appeared by its solicitor, and the petitioners appeared by their solicitor; and that it appeared to the court that the parties represented and appearing by counsel fully and fairly represented all the various securities and interests pertaining to said trust, and to an amount exceeding more than $4,000,000 ; and that the debt against the trust ought to be immediately paid, and that new and additional equipment ought to be procured to meet the increasing wants of the line :—wherefore it was ordered that said receivers and managers be authorized and empowered to borrow $500,000, free from personal liability, by issuing and disposing of their promissory notes, signed by Brainerd, Clark, and Smith, " a majority of said receivers and managers," as the decree says ; though Brainerd and Clark had gone out as receivers and managers a year and a half before, and Cheney and Taylor had been appointed in their place ; and the original receivership of three had become substituted by a " board of management " of five, as per

70

decree of August 16, 1867. Said notes were to be on twenty
years at 8 per cent., free from income tax, and were all to be se-
cured by special pledge and lien upon specified equipments, and
on car service to pay interest and their repairs, and the balance
to be a sinking fund to pay said loan and notes as they be-
came due, with discretion as to its use. The decree provides,
that if said notes or interest should not be paid when due, the
holders " shall be at liberty to apply to that court for relief in the
premises, by the enforcement and realization of their said securi-
ties ; " and then provides as to any excess of funds after paying
said notes and interest.

The decree then authorizes the borrowing of $500,000 more in
the same manner as to notes and security, " if in the judgment
of the receivers and managers, and the committee of the first and
second mortgage bondholders, it should be deemed advisable for
the interests of the trust property," etc. On the 28th of October,
1869, a document was executed, designed to authorize carrying
into effect this latter part of said decree, though it recites the
decree as having been made in May, 1869, while it was made
April 13th, 1869 ; and that " the receivers and managers " were
authorized in that behalf, and it is signed by Smith, Taylor, and
Cheney, " trustees and managers," not " receivers and mana-
gers ; " while, as before stated, Brainerd, Clark, and Smith are
designated as a majority of said " receivers and managers " in
the earlier part of the decree, who personally were to sign the
notes, though, as before said; Brainerd and Clark had ceased in
August, 1867, to be receivers. At present we make no comment
upon such a confusing of official designation in reference to per-
sonal acts to be done by the persons named. Thus is the record.

A decree of May 17th, 1871, authorized $500,000 of new
Vermont & Canada stock, and the trustees and managers to
issue notes for $1,000,000, to be guaranteed by the Vermont &
Canada Railroad Company. The petition was dated May 16th.
Decree was May 17th, stating that it appeared that the Vermont
& Canada Railroad Company by stockholders' vote, voted to issue
said stock, and to endorse and guarantee said notes ; and that the
Vermont Central Railroad Company by a stockholders' vote, had

approved of, and assented to, the same proposition, both compa-
nies appearing by solicitors and assenting that the prayer of the
petition be granted ; and the committee of bondholders appearing
and assenting, and it appearing that the facts in the petition were
true, the decree was made ; and in it the trustees and managers
are authorized to indemnify the Vermont & Canada Railroad
Company against the guaranty, " by a proper contract," stipula-
ting that, on failure to do so, said company should " have the
right to apply for a summary order on petition for relief in this
cause, to protect them against such liability, and for such appro-
priation of the earnings of the roads as to the court shall seem
just and equitable, and *in accordance with the prior orders and
decrees of the court in this cause.*"

There was, April 20, 1872, a decree authorizing $2,500,000
notes to be issued on 30 years at 8 per cent., free from income
tax.  The petition represents that the 1st equipment loan was
about to fall due, and good management required that payment
should be provided for ; that there was a large temporary loan
against the petitioners, increased by necessary purchases *for the
lines of road recently leased by the petitioners* with the sanction
of the court, which debt should be funded ; that the large in-
crease of business, especially on the leased lines, required exten-
sive additional equipments, for the proper development of the
business thereon ; that there was then a large amount of equip-
ment upon the roads, not specifically covered by former equipment
loans, which was available for security for the proposed loan, as
well as additional equipment to be purchased with funds arising
from said loan ; that, in their opinion, the best interests of the
trust property would be subserved by the issue of an additional
loan.

Notice for a hearing at chambers on the 25th was ordered to
be given to the Vermont Central and the Vermont & Canada
Railroad Companies, and to the committee of the first and second
mortgage bondholders, by copy, four days before the hearing.

The record shows a written consent by said committee, signed
by Pinkerton and Drury ; that the two railroad companies ap-
peared by their presidents ; that it appeared from the proofs that

said petitioners, and said Pinkerton and Drury, were largely interested in the various securities· in said railroads, and that all the averments of the petition were true; whereupon the issue of said amounts was authorized for the purpose of retiring the $700,000 first equipment loan, and subjecting the security therefor as a security for the new notes exchanged for the old, and making provision in detail in that respect. The decree then proceeds, — *" That the notes issued under this decree shall constitute a lien and charge upon the trust property under the control of said trustees and managers, and the earnings thereof."* This is the last decree authorizing loans by issuing notes and giving security.

Along from time to time within the period of these proceedings and decrees for raising money by new stock, and by notes and ·pledges, there had been sundry decrees and orders changing and appointing managers, ratifying contracts of lease and of " traffic and transportation," bringing within the hand of the " receivers and managers," or " trustees and managers," or " board of management," the management of various other railroads, and some steamboats, as within their official administration as receivers and managers of the Vermont & Canada and the Vermont Central Railroads. Some or all of these may be again referred to for particular purposes.

The record of the proceedings and decrees thus epitomized, and of those last referred to, shows that all were by petition, professedly in the original cause, and professedly in furtherance of the administration of the railroads and property provided for by the compromise decree of 1864; all were instituted by petition of the managers, by whatever name called, professing to be holding office authentically, and acting therein by appointment in said cause and under said compromise decree ; all professed and were ·represented to the chancellor to be amicable, and mainly to have been devised and agreed upon by leading parties, personally and representatively having the largest interests involved ; all was done openly, some of the most important with ample notice for practical purposes to all interests, some with very meager notice, some with no notice at all by order of court or otherwise ; but all was matter of files and open records, freely accessible to all.

No one appeared in any case with protest of objection. No one made question or objection afterwards, till adversary litigation began in 1873.

In the mean time the administration went on under the compromise decree, helped forward by the subsequent decrees and orders before named, involving all interests—the stockholders of the Vermont & Canada Railroad Company, the stockholders and mortgage bondholders of the Vermont Central Railroad Company, the security holders under the various loans since 1865 inclusive, the lessors of the various other roads and steamboats that have come under administration by the petitioners, and other contracting parties of various relations, including current creditors of the trust, as it is called, to whom is owing what is called the floating debt.

The fruits of that administration have been participated in and shared by all those interests, down to the failure to pay rents, interest, and principal ; which failure first occurred after the compromise decree, in 1872. Of those fruits was the payment of rent to the Vermont & Canada Railroad Company, to the Champlain & Ogdensburg Company, to the Rutland Railroad Company, to the Northern Transportation Company, to the Missisquoi Company ; also of interest and principal on first and second mortgage bonds, of interest on the various loans, called by different names, from 1865 to 1872. As the result of all, including the succession of the Central Vermont Railroad Company to the management, has come to pass the condition of the matter as it existed at the time this petition was brought.

In view of all this, whatever might be thought or held as to the legal propriety of the compromise decree, and of the decrees and orders following it, but for the previous consent and the subsequent acquiescence in their execution, of the parties and persons interested, it would be without warrant of law, to hold that in the present proceeding, and for the purposes of the present proceeding, those parties or persons can now be heard to question the validity of those decrees and orders, whatever may now or hereafter be held to be the legal effect and practical result of them. Judgments and decrees that courts would not be authorized to

render, and which would be invalid but for the consent or acqui-
escence of parties to them or affected by them, often become valid
and binding and effectual, by reason of such consent and acquies-
cence; and especially is this true when such judgments and de-
crees have been acted upon by way of being executed and carried
into effect. The law of this subject of *consent decrees* is well
shown in the opinion drawn up by SHELDON, J., in *Wadhams* v.
*Gay*, Ill. Sup. Ct., Law Reg., July, 1875, 419, and the very mar-
row of it is contained in the language of O'NEIL, J., in *Edgerton*
v. *Muse*, 2 Hill (S. C.) 51, viz: "The court must exercise the
right of correcting its decrees in *ex parte* cases and *cases by con-
sent*, so long as they remain unexecuted; for although they pur-
port to be the act of the court, and as such have legal effect, yet
in point of fact they are the mere act of the parties. Neither the
facts nor the law can be said to be judicially ascertained in such
a proceeding. The only restriction upon the exercise of this
power ought to be the execution of the decree. It is then the
decree ought to be regarded as final, and to be an estoppel between
all parties and privies." This subject will be further remarked
upon further on.

There seems to be no ground for objecting to the matter of the
present application being presented by petition as distinguished
from original bill. The application starts with the assumption,
and holds it throughout, that the receivership created by the de-
cree of 1861, and carried forward by the compromise decree of
1864, and the decree of 1866, and the other decrees and orders,
has been a continuous, entire receivership, which is now to be
wound up in pursuance of the prayer of the petition, for the
reasons set forth in the petition. The original receivership, for
the purpose to be served by it, as matter of course, involved the
keeping open and pending of the cause in which it was created,
for all the purposes of administration and winding up; and in
that behalf the action of the court would be sought by petition or
motion in that cause, and not by original bill. The closing clause
of the decree is, "that said receivers and said roads and property
shall be at all times subject to the jurisdiction and orders of this
court," meaning in the pending cause.

By the compromise decree it was ordered, that " the cause * * * * shall be continued on the docket of the court, and any party in said cause shall be at liberty to apply to that court from time to time for further orders in the premises as he or it may be advised." And the special act, authorizing the compromise adjustment to be carried into effect, provides for petitions in lieu of bills. The course and details of administration, instituted and put into operation by that decree, rendered necessary such a keeping on foot of the original cause, for the purpose of orders and acts answerable to current exigencies. The cause has thus been kept on foot, and the entire administration, so far as helped or participated in by the Court of Chancery, is shown by the record to have been in that cause. Now a final order is asked, for the closing out of that administration, for causes that have come to exist in and by reason of that administration.

The original parties to the cause as orator and defendants, have continued, personally or by succession, to be parties for all the purposes for which the cause has been kept on foot. Other parties in interest have become such by connecting themselves in one way and another with the current administration of the subject-matter since the compromise decree, and have thus subjected themselves to the scope and operation of that and subsequent orders and decrees in virtue of which that administration has gone on, so far, at least, as form and manner of judicial procedure is concerned. As the subject-matter of the petition, and the grounds on which the action of the court is asked in it, consist of the proceedings, and decrees, and orders in the cause as it has been kept pending, and of the administration of the property under them, a petition for the presenting of the matter under them for the consideration and action of the court is the form and manner contemplated by the law under the original decree, and by the parties under the special act of the Legislature and the ensuing compromise decree. So we have no occasion to pass upon technical questions as to form of precedure raised upon the rules and practice in chancery in ordinary cases.

The petition must be maintained, if at all, upon the grounds and causes assigned by it.

For what is to ensue towards the decision and disposition of the case in hand, it seems proper, in a summary way, to propound the *status* of the matter, relatively to the various interested parties, resulting from the course of events. At the time of the leasing by the Vermont & Canada Railroad Company to the Vermont Central Railroad Company, the latter owned and was running its road. By the lease it acquired the perpetual right to the possession and use of the Vermont & Canada Railroad, to every intent that the Vermont & Canada Railroad Company had such right under its charter and the laws of the State—the Vermont & Canada Railroad Company having excluded· itself from every right except that of corporate existence, and the right of having the rent paid according to the terms and legal effect of the lease. The Vermont Central owned all the equipments; the Vermont & Canada Railroad Company none, and never has owned any. Under the decision of January, 1861, the beneficial right belonging to the Vermont & Canada Railroad Company was, to have its rents, and as a security and resource therefor, to have the net income from the use of both roads applied to the payment of that rent, in preference and priority to any other party.

After the lease was made, the Vermont Central Railroad Company made its first and second mortgages, subjecting them expressly to the existing lease. At the time of said decision of January, 1861, the only parties in· interest were the Vermont & Canada Railroad Company under its lease, and the Vermont Central Railroad Company and its mortgagees. The lease contains no provision for devesting the title of the Vermont Central Railroad Company under it for failure to pay stipulated rent. It gave the Vermont & Canada Railroad Company the position and standing of a creditor for the rent as it accrued due, with the first right to the net income as a security and resource for its payment. This left the Vermont Central Railroad Company and its mortgagees in the posture of debtors for the rent accrued due, subject to the usual remedies against corporations as debtors and their privies, and in addition, precluded from the right of pocketing income from the use of the roads till the due rent should have been paid.

As before said, the Vermont Central Railroad Company then owned its road, and held the lease of the Vermont & Canada Railroad Company, and owned all the equipments and movable property used upon the roads. Virtually and practically, under the lease both roads became a single one in the permanent and perpetual proprietorship of the Vermont Central Railroad Company, and under the permanent and perpetual possession and control of the Vermont Central Railroad Company, subject to the first right of the Vermont & Canada to the net income, to pay rent four months and more overdue.

In this state of title, and right, and liability, as between the parties to the lease and the 1st and 2d mortgagees, the bill was brought by the Vermont & Canada Railroad Company in 1855, to enforce its security and resource for the overdue rent. That resulted in the decision and mandate of the Supreme Court of January, 1861, and in the decree of the Court of Chancery as of the next April Term of that court, by which decree, "the possession, management, and control of the said railroads and railroad property" were to be held by the receivers named, who had been receivers pending the litigation of the rights involved, then determined by the Supreme Court, and to be carried into effect by said receivership.

What, that belonged to the Vermont & Canada Railroad Company, went to the receivers under that decree? Not the legal title to the railroad of that company, for that remained in said company subject to the lease; not the right to the rent, for it was to answer that right to that company that the receivership was created; not the possession and use of the roads and property as the means of earning the rent, because the Supreme Court refrained from deciding that the Vermont & Canada Railroad Company was entitled to such possession and use, and decided only that that company was entitled to the net proceeds of the use in payment of the rent in arrear, and to that end the possession and use should be given to the receivers and not to said company. In practical effect, then, the *property* that went into the hands of the receivers belonged to the Vermont Central Railroad Company, charged with first right of the Vermont & Canada Railroad Com-

71

pany to have the net income applied in payment of four months overdue rent.

In practical effect, all the accretions to the permanent property of the railroads, wherever located, whether additional road built or permanent structures erected, belonged to the Vermont Central Railroad Company, the same as the road as it was when the decree was made. The issuing of new stock by the Vermont & Canada Railroad Company, as a means of raising money with which to make such accretions and adding it to the cost of construction, did not take any money belonging to that company, but the money only of the individual persons who should buy such new stock, trusting to the credit and ability of the Vermont Central Railroad Company and its successors to pay 8 per cent. on it according to the provisions of the lease. It was in effect a mode for enabling the Vermont Central Railroad Company and its successors in management to raise money at 8 per cent. on the crdit of their ability to pay, with the security provided in the lease, for the professed purpose of meeting the expense of such additions of road and structures.

As has been before remarked, the receivership went on under the mandate and decree of 1861, till the compromise decree of 1864.

The occasion, and the authority of the court, for creating and carrying forward that receivership have never been questioned by those who were parties to the cause when it was created.

The mandate of the Supreme Court expressed the judgment of the court, after sharp contention and exhaustive argument, and upon full consideration, as to the rights and liabilities of the respective parties, and the receivership was adopted as the only practicable and legitimate form and mode of remedy in the premises. It was not for the purpose of holding, using, and preserving the property pending litigation, as it had been prior to that mandate and decree of 1861, and as many receiverships are that are spoken of in the books and involved in the cases. It was not for the purpose of holding for sale and the realization thereon of assets with which to pay off a mortgage on foreclosure, and in the meantime to care for and preserve and use the property in

the interests of all concerned, as are many of the cases which are common and familiar. It was not for the purpose of winding up and closing out a corporation and its business, instances of which have often occurred. It falls within the expression in 2 Redfield on Railways, 364, of a receivership that " in equity becomes indispensable in order to enforce the execution of a judgment or a lien against a corporation." The Supreme Court had adjudged due the stipulated rent on an ascertained sum, for which the orator was entitled to enforce the security provided by the lease. Under the circumstances it was a case " of absolute necessity," as expressed by MILLER, J., 2 Wall. 523, and repeated in High on Receivers, 237. For, though the orator was free to pursue its claim for due rent by the ordinary process of law, still, such course would not only have been unavailing, but ruinous, in the event, to itself and to the other interests involved; for only the chattel property of the Vermont Central Railroad Company could have been reached by execution; and to have stripped the road of that, would have resulted much like killing the hen in pursuit of the golden egg.

It is plain, however, that the court, in ordering the receivership, had in mind only to answer the exigency, viz., to make it the remedy provided and warranted by the law, answerable to the right of the orator to have the rent due paid; and to be continued only so long as might be necessary to that end. It is plain, too, that it was designed to work that result in the shortest time practicable; for the court declined to carry into effect the provision of the supplement to the lease of July, 1850, by putting the orator into the possession and management of the roads; and the court thus declined, for the reason that the management might be such as to render such possession unduly continuing; in the meanwhile the cause would have to remain on foot, and the orator in possession, amenable to the court for the proper administration, and a proper accounting for, and application of, the proceeds.

It was supposed that a receivership, interested to have the prior right of the Vermont & Canada Railroad Company satisfied at the earliest practicable day, so that subsequent rights and interests might be served by the property, would result in the earliest

practicable enfranchisement of the property from judicial control, and the final closing of the suit. In this way it was thought, in the language of Judge REDFIELD's book—before cited—that the court would " do as little injury as possible, and assume as little charge or responsibility as practicable."

After two years under said receivership, the parties to that suit came to think that another mode of serving the rights, interests, liabilities, and duties involved would be better. Hence the agreement of June 4, 1863, and the petition of the orator based upon it, and the proceedings and decree of January 19th, 1864. It is part of said agreement that it is made a condition that such " a decree is obtained in the suit now pending (the bill for the purpose to be amended if necessary), as shall render this adjustment legal and binding on all parties interested in said Canada and Central Roads, and that such legislation shall be obtained as will render such agreement legal." The contemplated legislation was obtained.

Adding to or repeating what has already been said as to the compromise decree being a *decree by consent*, and beyond the scope of the original bill and the original mandate and decree, it is now remarked that the compromise decree did not contemplate or involve judicial deliberation or judgment as to its substantial and effective provisions. It was devised and put in form as the outcome of the mind and will of the parties—as the mode of consummating into validity a mutual arrangement by the parties as to their respective rights and interests, and as to the mode and means by which the property was to be held and used in serving and satisfying those rights and interests. That decree adopted what had been created by the court as a receivership, as known and warranted by the law; but the administration of it was not left to the judicial judgment and direction of the court under the law authorizing and governing a receivership known to the law as such. Instead thereof, the parties enacted a code *ex contractu* for the administration of the property, and provided *ex contractu* that there should be the formality as of a decree supervening thereupon. Since that the administration has proceeded in pursuance of that fact and of that formality—practically an adminis-

tration by the agreement of leading real and representative persons and parties. All the orders that have since been made have been applied for by the persons holding the management under the decree of 1864, and subsequent ancillary decrees and orders; and upon the assertion and showing that, in the main, they had been agreed upon, and agreed that such decrees and orders should be obtained. In none of them has there been any adversary proceeding, nor any ground or occasion given for examination, and the exercise of original and independent judicial judgment by the chancellor. The parties on whose application, or with whose co-operative concurrence, said decrees were obtained, can claim for them only that they are *consent decrees.*

In this connection it occurs to remark, that the first adversary proceeding shown by the record, was in March, 1873, by petition by the Vermont & Canada Railroad Company for an order on the managers to pay rent then over due, and for an order removing the managers; and a petition by certain bondholders to remove the managers. When, in the course of proceeding—and the only course provided or warranted by the law, viz., a reference to ascertain the grounds and cause upon which the court should act in deciding upon the prayer of the petitions—the court proposed to order such reference, all of said petitions were withdrawn, and the matters left *in statu ante bellum.*

So that all the orders and decrees signed by the chancellor, touching the management of the railroads, except the one appointing the Central Vermont Railroad Company to the office in substitution for the former board, were, in point of fact, to be regarded as consent decrees—so understood and treated by the parties—and so understood and regarded by the chancellor. And it may be remarked here, to be recurred to hereafter, that such decrees have been often made, and are common in this country and in England. Such a decree was made in the case of the Rutland & Burlington Railroad, and was operative for ten years, without question or dissent. The decree by Mr. Justice BRADLEY, 2 Wood, 506, *Stanton* v. *Ala. & Chat. R. R. Co.,* was upon the consent of the parties interested. See also cases referred to in *Wadhams* v. *Gay,* Law Reg. July 1875, p. 427, of *Jenkins* v.

*Robinson*, and of *Edgerton* v. *Muse*, already cited in another connection. In *Farmers Loan & Trust Co.* v. *Central R. R. Co.* of Iowa, a suit for the foreclosure of a railway mortgage in the U. S. Circuit Court of Iowa, LOVE, J., says: " The Circuit Court did not enter the decree (in question) upon any independent consideration of the rights and equities of the parties, but solely upon the assumption that the parties to be affected by it assented to the provisions of the decree."

By the provisions of the compromise decree, the occasion and purpose for which the receivership was created ceased, viz., the payment of rent four months in arrear; for all such rent had been satisfied by funding it into new stock, except $97,000, for the future payment of which, provision was made for it to be afterwards satisfied, not by income from the roads, but by new stock at 8 per cent.

That decree, and the agreement which it was designed to carry into effect, looked to the establishment of a continuing and, practically, a permanent system of tenure, control, management, and use in the service of all rights and interests involved. Hence, and in this view, the advisory board was constituted, with provision that their services should be compensated out of the income as expenses of administration, and their functions were prescribed, one of which was, auditing the accounts of the trustees and receivers, which, on being approved, might be allowed and passed by the court without further proceedings.

The decree of April 14th, 1866, and the proceeding upon which it was made, evince that it was understood to be the purpose to effectuate by the decree a permanent system for the control and administration of the property. The substance and details of that decree embrace and deal with subjects of which the court would have no cognizance under the original bill and decree, nor under the bill on which the decree of 1866 was made, but for the agreement, consent, and asking of the parties, by reason whereof both the decree of 1864 and that of 1866 were made.

The same is true as to the various other applications to the court, and the proceedings thereupon, and the ensuing orders and decrees, as shown by the files and records of that court.

The loans asked for and authorized, and the securities provided, and the purposes of the expenditures, indicated, and even assumed, that the existing system was to continue at least during the periods of time limited for the payment of the respective loans—as ten, twenty, and thirty years—and indefinitely thereafter according to current circumstances and exigencies. The transaction of creating the " board of management " of five, instead of the former three, August 16, 1867, and the functions assigned to the board, were in furtherance of the idea of a permanent system, to be executed upon the judgment of those in control, and not of the court. The *leases*, if there be such, and the "contracts for traffic and transportation," and "contracts for use and control," which were made by the managers with other parties, bringing under their management other railroads and steamboats for terms of years, bearing the approval and ratification of the chancellor, demonstrate the same thing. Equally explicit to the same intent is the transfer of the management from the board of five to the Central Vermont Railroad Company. This was expressed by Gov. Smith in giving his testimony before the special masters, in these words : " That by the decree of 1864, the whole plan of management was entirely changed, and the whole property was to be managed independent of the court, and by the parties interested, except that it might be necessary for the court to exercise its general control over the property." It was expressed in the report of the trustees and managers of October 2, 1872, on p. 6. " By the terms of the compromise it was provided that the road should be held permanently in the hands of the Court of Chancery, and the earnings, after paying the expenses of operating and maintaining the property, should be distributed among the holders of the several classes of securities, according to their order of priority. By the provisions of the last decree, the status of the parties became fixed, and the relations of the trustees and managers to the property and to the security holders were established ; while at the same time their relations to the public as common carriers, charged with the duties and incidents attaching to such a position, were defined."

The provision in the compromise decree as to the payment of

rent to the Vermont & Canada Railroad Company is decisive as to the purpose of a permanent system. It provides that the rent is " to be paid by the trustees and receivers from time to time in possession on the 1st of June and December in each year continually." Besides this, from the nature of the case, perpetuity must result, for the rent was to accrue and become payable thereafter in each current year. There would be no final close, therefore, of what was to be done in this behalf, so long as the lease and decrees should continue valid and operative.

The contrast between the receivership of 1861 and the management under and since the decree of 1864, is striking. Under the former, the court was proceeding upon its judicial prerogative, in the exercise of judicial judgment and discretion, according to the established principles, rules, and usages of the law in such cases, to the single intent of enabling the orator party to realize its rent under the lease, by the proper use and management of the two railroads and the connected property, with current accountability of the receivers for their doings to the court, of which they were the hand,—the court having constant control of the appropriation of the earnings, and' of the application of the net income to the one purpose of paying the rent in arrear.

Under the latter decree the position of the court has not been that of prerogative, and control, and direction, but has practically been that of subordination to the agreement of parties. Its function has been virtually the giving of formal assent and acquiescing sanction to what had been devised and agreed upon by the acting parties, in the manner, and with the views, already sufficiently shown.

This presentation of the two decrees, and of the course of administration under them, and the relation thereto that the court and the parties have respectively held, has in view the bearing which these matters have upon the question of right and duty on the part of this court upon the petition under consideration. It is claimed that the management and administration, since the decree of 1864, has been in such a sense that of a receivership, known and carried forward by the law, as to require of the court the same consideration, and the application of the same principles,

rules, and usages, as in the case of such a receivership as existed in the cause prior to the compromise decree.

It is a fundamental element in any idea of a receivership under the law, that there should be such a necessity for it as to render it the duty of the court, in the exercise of its judicial judgment upon the case presented, to exert its prerogative in that behalf, and create the receivership in the discharge of that duty. It is never to be created because it will do no harm ; nor even because it will do good, unless the exigency be such as to impose the duty upon the court. See all the books and cases on this subject.

The only *necessity* that existed in this case was, that such was the only practicable way within the authority of the court for enforcing the payment of the rent in arrear. When that rent was satisfied by other means, the necessity vanished.

In what was provided in the compromise decree as to the. possession and management of the property, the court was performing no duty, but merely accorded, *ex gratia*, assent and ratification. It exercised no judicial judgment, and did not put forth the exertion of its prerogative. It is equally fundamental that the court is to have the active and responsible control of the administration. That was not so in this case ; but on the contrary, the whole course, in general and in detail, was devised and executed by the managers, and their associates and advisers in interest, without any supposition on the part of themselves or of the court that the court had any real office to perform calling into exercise judicial judgment, direction, or control.

It is fundamental that in a receivership involving and requiring the carrying on of a business in order to meet the exigency which caused the necessity for it and made it the duty of the court to create and maintain it, such receivership should not go outside of the subject and purpose of it, and what is necessarily incidental thereto. Rent in arrear, to be paid by the earnings of the two roads run as one, was the purpose of the receivership of 1861 ; and those roads, with fixtures and equipments, were the property in the hands of the receivers to be used by them in making the contemplated earnings. Of course, while thus in their hands, the property was to be used and treated upon the same considerations

72

as would properly have been entertained and acted on by the owners, using it for the same purpose, viz., legitimate earnings. This would involve the condition of the track, the depot accommodations, the equipments for service, the force of help to be employed, and the relation to and connection with other roads, as affecting the business and earnings of the road in hand. While the current use of the property looked specially to the realizing of net income, the property itself was not for that reason to be subjected to deterioration and waste; but it should be kept in proper condition, not only for doing the current business during the receivership, but for continuing to do it, without the necessity for special and extraordinary outlay on passing back to the possession and use of the owners. But, for any legitimate purpose, the receivership could not be extended to the control, and maintaining, and repairing, and equiping other roads, or to the building or buying of other roads, or to the control and operating of lines of steamboats, or steamboats in the lines of other roads, even with the view of larger earnings, and larger net income of the property which is the subject of the receivership; and much less, for the reason assigned, for the contract for the equipment and use of the Missisquoi Railroad, viz.: "That the petitioners are largely interested in the trust property under their management, and that said railroad when completed will be a valuable adjunct and feeder to the roads under the petitioners' management, and that the contract is an equitable and fair one between all parties interested;" and much less, also, for the reason assigned in the petition for the confirmation of the contract " for the use and control " of the Rutland Railroad, viz.: " That it will prove exceedingly beneficial to the trust property under the management of the petitioners, and that increased and enlarged facilities will be offered to the public by facilitating the connections between the roads aforesaid." Similar reasons are assigned for the contract with the Ogdensburg & Champlain Company, also with the Northern Transportation Company, and for many of the other orders with reference to the administration by the managers ; and so, further repetition is needless for the present purpose.

It is fundamental in the law that a receivership is temporary,—

Vermont & Canada R. R. Co. *v.* Vermont Central R. R. Co. et als.

to serve an existing exigency of a temporary nature, and when that is done, it is to cease. The idea that a court, in virtue of its prerogative in that behalf, is to take upon itself the office of instituting a receivership to be perpetual, and to do the duty of a court in controlling, directing, and enforcing the administration in the management of a business for the profit and emolument of the parties interested, and not to serve a present exigency, rendering it necessary in order to prevent a failure of legal justice and right, has not yet been propounded in any book on the subject, nor entertained and acted on in any case. The language of MILLER, J., in *Mil. & Min. R. R. Co.* v. *Soulter*, U. S. Sup. Ct. 2 Wall. 510, is pregnant with the true idea and sentiment of the law, viz.: " That the appointment of receivers by a court, to manage the affairs of a long line of railroad, continued through five or six years, is one of those judicial powers, the exercise of which can only be justified by the pressure of an absolute necessity." To that effect are all the books and cases.

A paragraph, a part of which we have already quoted, from 2 Redf. Railw. 263–4, is significant and comprehensive in this respect. I copy it, as follows : " And it was said by Lord ELDON (17 Ves. 315, 323), that it offered no invincible obstacle to the court appointing a manager or receiver to have charge of the business of a corporation, that it might subject the court to the care and responsibility of conducting for the time the business of the company. That in equity becomes indispensable in order to enforce the execution of a judgment or a lien against them. But the court will so modify its order as to do as little injury as possible, and to assume as little charge and responsibility as practicable."

As embodying and enforcing the same idea, the language of the decision of the Supreme Court of Alabama, in *Myers* v. *Johnston,* reported in Central Law Journal, February 2, 1876, is quoted thus : " Suppose that by a provision in a mortgage, it might be stipulated that upon the happening of a certain default, the mortgagees should be entitled to apply to a court of equity and have persons denominated receivers appointed to manage a business or undertaking, or to carry a work on to completion, under its direc-

tion. Yet how could this, though ever so amply expressed, impose on the court the duty, or clothe it, as a court, with the capacity, to do so.? It is within its province, in aid of 'an *interim* management' of a 'going concern,' with a view to a sale thereof, or during the pendency of a controversy in which the rights of conflicting claimants are to be determined. It cannot take upon itself the execution simply of schemes or projects of either private or public utility. The provision supposed would, perhaps, create interests in the mortgagees which a court of equity might take notice of and protect. The persons, though appointed by it in consequence of the stipulation, to manage the business or undertaking, or to carry the work forward to completion, no matter by what name called, whether receiver or something else, would (we apprehend) be properly, not officers of the court, acting under its direction, but trustees for the parties, having such powers and duties as are legally created by the contract and as are recognized and imposed by the law relating to trustees."

It is in point to cite the language of Lord Justice CARNES in *Gardner* v. *L. G. & D. Railway Co.*, Law Rep. 2 Chancery Appeals, thus: "Now I apprehend that nothing is better settled than that this court does not assume the management of a business or undertaking, except with a view to the winding up and sale of the business or undertaking. The management is an *interim* management; its necessity and justification spring out of the jurisdiction to liquidate and to sell; the business or undertaking is managed and continued in order that it may be sold as a going concern, and with the sale the management ends."

Such was not the purpose for which the business in the case before us was managed and continued under the compromise decree.

In *Crane* v. *Ford*, 1 Hopkins, 114, where a boat had been run for two seasons by a receiver holding the property pending litigation, a sale was ordered on application of the complainant. In deciding to grant the application the chancellor said: "It is highly inconvenient and unfit that such operations should be conducted under the direction of this court for so long a time."

In view of all that thus appears and has been set forth, it is plain that when the receivership under the mandate and decree of 1861 was changed by the compromise decree upon the agreement of the parties, by which it was designed to embrace and effectuate such a handling of the property, and for such purposes as has taken place ; when, in point of fact and effect, the arrangement consummated by that decree made an end of the rent in arrear, for the payment of which alone the mandate of the Supreme Court ordered the receivership, and substituted therefor ends to be accomplished, and modes and means for their accomplishment, beyond the scope of the bill and mandate, and beyond the judicial function of the court in that cause, the whole matter thereafter went on, in substance and effect, as matter of agreement, supervened upon by the consent and approval of the Court of Chancery, as *per agreement*.

And though it may be repeating what has already been sufficiently expressed, beginning with the compromise decree, that and the succeeding orders of the court must be regarded as but the formal sanction of what was shown to the court as having been agreed upon by the controlling parties, prior to making application for the orders, including the agreement that such application should be made and such orders obtained. The force and effect of such orders result from the contract of the parties, and not from judicial judgment exercised by the court. " A judgment of court by consent adds nothing to the force of the original contract or compromise," is the language of Ch. J. REDFIELD in his note to *Wadhams* v. *Gay*, already cited. The parties and the interests involved must be regarded as holding and maintaining their relations and substantial rights by force of such arrangements, agreements, and contracts, and not by force of judicial proceeding, such as would have been had if a receivership, such as the law contemplates, provides for, and warrants, had gone on, and had not been subjugated by the parties, and transformed into a matter of personal control and management in substance and fact, extending even to the position that the Court of Chancery was to sustain, and the part it was to have and enact in what en-

sued, and that was, in a sense, *ministerial*, and very slightly, if at all, *judicial*.

Now, again going back to the compromise decree, and following down to the bringing of the present petition. It was designed by that decree, and has been the purpose of the administration under it, and such has been the substantial result, that all the property embraced in the original receivership under the mandate of the Supreme Court should be *pooled* (to use a modern term), and placed in the management of those who had been receivers under the mandate, to be thereafter held and managed in the interests of all concerned, according to the agreements from time to time of the parties in interest; that those holding the office of receivers down to the compromise decree were thereafter to be, and in fact were to August 16, 1867, the managing agents of the parties in interest, and not officers of the court in any but a merely formal and nominal sense, and even in such sense, only by force of the agreement of parties, and only to certain intents in furtherance, and to facilitate the carrying out, of the arrangements and agreements of the parties; and after the 16th of August, 1867, " the board of management" held the same position and functions, down to the substitution of the Central Vermont Railroad Company in the management, June 21, 1873.

At this time, and for purposes at present to be served, we do not deem it necessary, nor perhaps proper, to be more specific in assigning character and legal quality to the persons having the office of management since the compromise decree, than to call them *managing agents*, leaving for future consideration and determination the legal quality of their office and the legal effect of their acts; remarking at this point, that the participation of some of the parties in interest in the current administration, in one way and another, through advisory boards and standing and temporary committees, and by stockholders' and bondholders' votes, and by the action of directors, may have an important bearing in determining ultimate rights and liabilities, if they should hereafter be brought in question before the courts; as also may the fact that the managing parties have been largely interested in the subject-matter and the results of the management.

Vermont & Canada R. R. Co. *v.* Vermont Central R. R. Co. et als.

And we repeat, — the arrangements, agreements, and contracts between the various and respective parties, and their conduct under them, constitute the ground and productive force of their respective rights, liabilities, and duties.    The form of judicial proceeding, and the sanction of the court, cannot be held to control, or essentially to modify or add to, the force and effect which those arrangements, agreements, and contracts would have, if such form of judicial proceeding had not supervened upon them.    See *Wadhams* v. *Gay*, and note by Ch. J. REDFIELD, before cited; *Jenkins* v. *Robinson*, Law Rep. 1 Sct. & Appeal Cases, 117; *Edgerton* v. *Muse*, before cited; *Youngblood* v. *Sexton*, 2 Am. Law Times Rep. 539; *Union Bank* v. *Marin*, 3 La. An. 34.

In the Scotch case just cited, Lord ROMILY said: "When an action is brought and a verdict is obtained by the pursuers [plaintiffs], which is set aside, and an arrangement afterwards takes place, by which, in consideration of the payment of a sum of money, an interlocutor [judgment] is pronounced for the defenders, and the court simply registers that interlocutor, without expressing any judicial opinion on the subject, I am of opinion that it is contrary to all principle to consider that such a transaction can be treated really as a *res judicata* ; * * * * the court has merely exercised an administrative function by recording the interlocutor which had been agreed to between the parties." The Lord Chancellor used language to the same effect; and Lord COLONSAY concurred in the same view in the opinion given by him.    The decision of the House of Lords was in accordance with those opinions.

In the Louisiana case under the civil law, ROST, J., said: "A decree thus rendered [by consent] is not, legally speaking, a judgment.    A judgment is the decision of a controversy, given by a court of justice between parties who do not agree.    Consent decrees decide nothing.    They merely authenticate private agreements, and render them executory between the parties.    Their effects as to third persons are those of transactions made in an authentic form."

The petition cannot be maintained then, and the prayer thereof granted, on grounds and reasons and rules of the law peculiar to

a receivership as it is understood and provided for and warranted by the law. If it were to be assumed that the trust debts, as they are called, including what is called the floating debt, would be a first lien on all the property, if incurred in the administration of a proper receivership, and that it would be the province and duty of the court to order the sale of the property, as the only means of giving effect to that lien, in rightful satisfaction of such debts, it would not follow that such is true in the case as it is before us.

For what this court now has in hand, it is not permissible to stand upon technical names, as indicating technical, formal, or even substantial differences in the offices to which names are technically and strictly appropriate. The managing officers have been designated at times, " receivers," " receivers and managers," " trustees and receivers," " trustees and managers," "board of management." " Trust property," " trust debts," are most frequently the designating terms of the property under the management, and of the debts created in it. So that the substance and fact of the matters involved are for consideration, and not the names used, only so far as those names give clue to what was understood and intended to be the true character and quality of those matters.

For the purposes of this case, we have no occasion to hold or deny, that in a receivership, created and administered by the court, the expenses of administration are to be paid under the direction of the court, and, if the exigency should require, they may be made a first lien on the property.

It was held in *Myers* v. *Johnston*, before cited, that " where a large railroad and its appurtenances are in the hands of a receiver, to be preserved and operated, the court having charge thereof must possess the power, after notice to and the hearing of the parties interested, to allow the issue even of negotiable certificates of indebtedness, creating a first lien where this is necessary to raise money for the economical management and conservation of the property, until it shall be disposed of." This was held in a case of mortgage, which, when foreclosed, would result in the sale of the property, and in the decision of which it had previously been

said that, in the opinion of the court, " the case ought to be of great urgency in which the court should appoint a receiver, to manage and operate a railroad." And it had also been said, " that the inconvenience and loss by the railroad becoming a dilapidated and useless wreck, which would be inflicted on the population of large districts, coupled with the benefit to parties, who perhaps could not take care of themselves, of preventing the rapid diminution of value and derangement and disorganization that would otherwise result, seem to require, not for the completion of an unfinished work, or the improvement beyond what is necessary for its preservation of an existing one, but to keep it up—to conserve it as railroad property, if the court has been obliged to take possession of it,—that the court should borrow money for that purpose, if it cannot otherwise do so in sufficiently large sums, by causing negotiable certificates of indebtedness to be issued constituting a first lien on the proceeds of the property, and redeemable when it is sold or disposed of by the court."

What is thus recited, imposes very rigorous and sharp conditions as giving warrant for the making of such a first lien. Such conditions have not existed and do not exist in the case in hand.

In *Jerome* v. *McCarter*, U. S. Sup. Court, Oct. Term, 1876, prior incumbrancers were making no objection to receivers' certificates being made a first lien. Only the assignee in bankruptcy of the mortgagor, standing in the place and right of the mortgagor, was objecting. Wherefore it was said by Mr. Justice STRONG, in the opinion :—" Whether the action of the court could make the receivers' mortgage superior in right to the mortgage which existed when it was made, it is needless to inquire." That was a bill for the foreclosure of a corporation mortgage made by the Ship Canal Company. The property was in receivership in that suit. The receiver had been authorized by the court to issue certificates and make security by mortgage, giving it priority to the existing mortgages.

The following from the opinion is so pertinent in many respects to the subject as it is involved in the present case, as to justify repeating, thus: " As a court of equity, having the mortgaged property in charge, it was its plain duty to preserve it, not only

73

for the benefit of the lien creditors, but also for the benefit of the company, whose possession the court had displaced. Under the provisions of the act of Congress granting the lands covered by the mortgages, the lands reverted to the United States unless the ship canal should be finished within a fixed period, and that period was passing away, when the order was granted to the receiver to raise money for completing the canal, by the issue of certificates secured by his mortgage. The canal was unfinished, and there were in the receiver's hands no funds to finish it. Hence, there was a necessity for making the order which the court made—a necessity attending the administration of the trust the court had undertaken. The order was necessary alike for the lien creditors and for the mortgagors."

*Stanton* v. *Ala. & Chat. R. R. Co.* 2 Wood, 506, was a bill by trustees of a first mortgage for the purpose of bringing to sale the property, and to have the proceeds applied according to the priority of the liens on said property. The bill prayed the court to determine the matters in dispute; to appoint receivers with full power to borrow money, and to cause the property to be protected, improved and administered until the further order of the court; and that, in the meantime, the road should be operated and the business of the company be prosecuted to the greatest advantage for the benefit of all interested. Trains had been running over the road, but a portion of it had been built in a hasty and temporary manner, and needed to be completed in a substantial way, in order to insure the safety of the trains. Mr. Justice BRADLEY appointed receivers to take possession of the mortgaged property, with authority to put the railroad and other property in repair, and to complete any incompleted portion thereof, to procure rolling stock, machinery, and other things necessary for operating the same, and to operate the same to the best advantage, and save and preserve the same for the benefit of the first mortgage bondholders and others having liens. The receivers were authorized to borrow money in a sum named for those purposes, to be a first lien on the mortgaged property, and to be paid before the first mortgage bonds. That priority was upheld, the order for borrowing money, with full power in that behalf, having been asked by the

Vermont & Canada R. R. Co. *v.* Vermont Central R. R. Co. et als.

mortgagees themselves; and therefore they were precluded from objecting to the effect of what they had asked and consented to.

It may be remarked in passing, that none of the debt, for which the petitioners ask a first lien to be declared, was incurred for the purpose of making additional road, rendered necessary by the Vermont & Canada charter, in order to save a forfeiture; for money for that purpose was procured by the new stock issued by that company, on which as a first right the stipulated rent was to be paid from the earnings of the property; against which right the petitioners now assert a claim of lien that in effect would abrogate that right to every practical intent.

In *Kennedy* v. *St. Paul & Rac. R. R. Co.* 2 Dillon, 448, mortgage bondholders applied for a receiver, and, in order to save their security, that he should be authorized and directed to complete some incompleted portions of the road, and put the whole in good repair, and therefor to borrow money to be a lien in priority to their own mortgage. On full hearing in behalf of all interests involved, Judge DILLON said: "It is manifest that unless a receiver is appointed no further work will be done on the extension lines, and that the land-grant, which is the only security of any considerable value which the plaintiffs and the other bondholders have for their large advances, will lapse and be wholly lost. In order to save this land-grant, the road must be completed by Dec. 3d ensuing, and it seems to me that the exigencies of the case are such as, under the circumstances, to warrant the court, upon the application of the parties chiefly interested, to appoint a receiver, and clothe him with the authority desired."

The order, most explicit in details and most carefully drawn, contains this, viz: "The main effect of this order is to ensure the completion of said roads by the 3d day of December next, and the receiver is instructed so to act under the limitations aforesaid, as to see that this object shall be accomplished, and to proceed at once, and with expedition." All which shows a case of necessity, imposing the duty upon the court of appointing such receiver, and that the relief to be given thereby was to be accomplished and the receivership ended at an early day.

In *Morrison* v. *Morrison*, 56 Eng. Ch. 7 De Gex, McN. & G.

214, receivers, made *consignees* of a West India estate, were holding trust property, to be converted into money by sale. The question was as to the allowance for certain payments made by them by order of court. Lord KNIGHT BRUCE said : " These payments must be looked upon as payments made in the proper administration of the trust, for the protection and preservation of that which was to be protected and preserved until it should be converted into money. They must be treated as having been made in the execution of a money trust; and it is impossible to permit the trust property to be enjoyed by any person claiming beneficially under the trust, without making good the expenditures and advances *bona fide* made in the execution of the trust under the authority of the court, whose duty it was to direct how the trusts were to be executed."

This case is cited in 2 Dan. Ch. Pr. for the text cited in the argument from that book, p. 1769. It was an application of the common doctrine that a trustee has a lien for the proper expenses of the trust upon the property of his *cestui que trust* in his hands as the subject of the trust. A mortgagee was opposing the allowance; but the case does not show how, for what, or when the mortgage was made, nor how it was related to the trust. It is inferrable that it was in subordination to the trust, and made after the trust had been created. The doctrine of that case is the same as was held in the Rut. & Wash. R. R. case, 47 Vt. 146. It determines nothing as to the priority of a receivership lien as against all incumbrances upon the *corpus* of the property, such as is claimed in this case.

The closing expression of Lord Justice TURNER is noticeable as indicating the character of that case, and in view of which the decision was made, viz: "The moneys due the consignee are moneys due to the court itself, and as the court has in its hands moneys belonging to the estate, on account of which it has made the payments, it must have the right to repay itself out of those moneys. This right has priority over the costs of the suit ; for as to funds in the hands of a trustee, his expenses must be the first charge on the fund."

*Cowdrey* v. *R. R. Co. et als.* 1 Wood, 332, was a bill to fore-

close mortgages, in which there had been a receiver in due course of law. Questions were made as to disbursements in managing the road, and as to interest paid for money borrowed. No question as to lien, or priority over existing incumbrances, was involved in the decision of the Circuit Court.

3 Otto, 352, between the same parties, was a suit for foreclosure. There had been a sale, and assets were in the hands of a receiver. The question was as to the allowance and payment out of those assets of an attorney's claim for services about said foreclosure by a prior suit, which got swamped in the Rebellion. It was allowed, involving no question of a receiver's lien in priority to existing incumbrances.

The references to Perry on Trusts, 818–824, are statements of the common doctrine as to the lien of a trustee upon the trust property for disbursements and expenses, the same that was held and applied in the Rut. & Wash. R. R. case, *supra.*

In this review of the cases cited by the learned counsel in the brief for the petitioners, upon the proposition that, " the receivers' debts are a charge and first lien upon the Vermont Central and the Vermont & Canada Railroads and all the equipment and property of the receivership," in only one case, *Myers* v. *Johnston,* was the distinct question made by mortgagees against the order of the court to that effect. In the other cases of express orders in advance, the prior incumbrancers asked for and assented to the making of the orders. In all those cases the lien was necessary as a means of preserving the property and securities. In all the cases the receivership was created for reasons and purposes which imposed the duty on the court to make the appointment, and to make the orders.

In the other cases of receiverships where allowances were upheld, the expenditures and services were in *receiverships* of necessity, and where the expenditures and services were in the administration of the office under the active and affirmative direction of the court. The other citations point to the common doctrine of the lien of trustees for the proper expenses and disbursements of administering the trust.

It has already been said, that in the case as it is now before the

court, and for the purposes of the case, the various parties in interest may not question the validity of the proceedings as shown by the record, so far as those parties are affected by consent and acquiescence in said proceedings and the carrying of them into effect. It is now to be remarked, that however they may be affected thereby, it must be in virtue of the substance and reality of what has been transacted by parties and court, and not in virtue of formality and semblance. In entering into the agreement for the compromise decree, and assenting to it, and acting under it, the parties are entitled to regard it, and to have it regarded, as being just what it was understood and designed to be, viz., a permanent arrangement by agreement for the administration and handling of the property, with such control by the interested parties as was provided for, and with such a relation to the original cause and the functions of the court as was understood to be provided for in that compromise agreement and decree. And the same is true as to all that ensued by way of orders and decrees. As did the compromise decree, so the subsequent orders and decrees, as to the various matters embraced, derived their force from consent. The present proceeding supervenes upon all that has been ordered and done, for the purpose of a final consummation and ending of the entire matter, and of dismissing it, and the parties, and interests from any cognizance of the Court of Chancery. Of course, this requires the court to have regard to the substance and reality of what has been done, whereby the matter is brought down to the present conjuncture.

As is said in *Wadhams* v. *Gay*, before cited : " Equity will penetrate beyond the covering of form, and look at the substance of a transaction, and treat it as it really and in essence is, however it may seem ;" and the judge proceeds by way of application : " In outward semblance, this partition decree is a decision of the court upon the relative rights of Charles D. Flaglor and his children under the will of Garrett. In essential character, it is but the judicially recorded supposed agreement of Flaglor."

The court could not, in the first instance, bind by judgment, decree, and order beyond the scope of the original bill, except by consent, and by acquiescence in the execution thereof ; and it

would be without warrant for the court to supervene upon what
has come to pass in virtue of agreement, consent, and acquies-
cence, and deal with the subject and the parties the same as if all
had been done within the scope of the original bill and under the
original decree, in the legitimate exercise of judicial prerogative,
in the discharge of judicial duty, and as the result of independent
judicial judgment.

So far as consent was given to, and there has been acquiescence
in, the compromise decree, and in its execution, it was on the
supposition that it would have operation and effect according to
the intent indicated by its terms and provisions.   But for that,
the agreement would not have been made, or the consent given.
It was in that view that it became the law for the administration
of the property, as distinguished from the law that ruled the orig-
inal decree, and would have continued to rule so long as that
decree was the rule and authority for the administration of the
property.   In that view, the Court of Chancery performed its
part in, and under, the compromise and subsequent decrees.   All
the contracts of lease have been entered into, and have gone on
in operation, in that view.   All the credits have been obtained
upon managers' bonds and their securities, and on stocks newly
issued, and changes and substitutions of credits and securities
have been made, in that view.   Now when it is claimed, or held,
that parties are concluded and bound by participation, acquies-
cence, or consent, it cannot be held that they are thus bound by,
and to, something other and different from the real substance and
fact of the successive proceedings, measures, and transactions, as
they currently went on, and were understood and intended by all
concerned.

If the Vermont & Canada Railroad Company had forecast that
it would be the possible result of the compromise decree, that the
Court of Chancery would have, or exercise, the power of ordering
a sale of all the property to a third party to pay the expenses of
administration under that decree, leaving rent unpaid and unpro-
vided for, would it have been party to the compromise consummated
by that decree ?   The same may be asked as to the mortgage bond-
holders of the Vermont Central Railroad Company, individually

and representatively. If such a result had been forecast, would parties have taken the various classes of equipment and guaranteed bonds, and other credits to the trust, purporting to be backed by specific security on the property, and on car service, and by the guaranty of Vermont & Canada Railroad Company? For what is the ground of the credit, and what the resource of the Vermont & Canada Railroad Company, but the stipulated rent, with the security for it, and the right to have it paid or realized as provided in the solemn contract of lease and the provisions of the compromise decree, namely, to be earned by the two roads under the administration provided therein, and by what ensued thereon by way of agreement and supervening orders of the court? Would the parties to that decree have agreed to its being made, and participated in its execution, if it had been forecast as a possible result that the effective force of the lease and mortgages, as contracts, was to be annulled, and the rights created thereby to be abrogated and rendered impossible of realization, and the decree itself to be declared a nullity, except to the end and effect of warranting the Court of Chancery to deprive the parties to it of the ground and subject-matter of their rights, which it professed to confirm, and was designed to serve and realize? Would the holders of the trust loans have become such if it had been forecast as possible that, not only the promise to pay, but the pledges of specific security, were by judicial act and sanction to be " broken to the hope," and further, not only not even " kept to the ear," but disclaimed and annulled? If other contracting parties had forecast such result, would they have entered into the various contracts of lease, and traffic, and control?

All present interests have come into present posture in full view of the system devised, and instituted, and carried forward by the compromise decree, supplemented by what has been devised and done since. The Vermont & Canada Railroad Company voluntarily assumed its part and position in reference to, and under, the decree of 1864, and participated in and helped forward the whole course of transactions and events down to the time it failed to get its 8 per cent. on $3,000,000 in June 1872. The 1st and 2d mortgagees of the Vermont Central Railroad Company did the

same, down to the time they failed to get payments under the administration which they had helped to establish and operate.    All bond creditors, and all floating-debt creditors, since the compromise decree, have become such, knowing, or bound to know, the legal and actual *status* and character of the subject and of the parties with which and whom they are dealing.    The Central Vermont Railroad Company solicited the official position of receiver and manager, upon a joint petition of itself and the then board of management, in succession to that board, and the position was accorded with all the responsibilities then existing and thereafter to accrue, which rested upon that board, and would thereafter have rested upon it, if it had continued in the management.

To all, the records of the Court of Chancery, and the files in the clerk's office, and reports in the office of managers, promulgated to all by pamphlets and newspapers, were accessible and intelligible; and they disclosed the *status* and the course of management under the decree of 1864, and what was the real character, in law and in fact, of that management.    The managers, and others having deep interest and active participation in the measures devised, and in the course pursued, were full of knowledge of all that was in progress, both official and not official; full of knowledge of what was the substance and reality of the matters in hand, and what was formal and factitious.    Ignorance of the facts cannot be asserted by any party as constituting an element or ground of right or claim to preference or priority as against or over any other party.    All and each must stand as claimants or creditors, with such rights as exist in them respectively, resulting from the reality of the transactions by which they are affected.    As their position as claimants or creditors has become fixed in view of the compromise decree, and the ensuing administration, designed, devised, carried on and regarded as already set forth, they are entitled to have that view realized to themselves respectively to the utmost extent practicable.    It would be without reason and without warrant, to bind them to the legal character of the receivership of 1861, as governing the prerogative and duty of the court in reference to the property and interests now involved, when, in point of fact and of law, the essential charac-

74

ter and purposes of the receivership were changed by the decree of 1864, and the whole course of control and management has been, not for the purpose to be served by the original receivership, but for purposes not in the mind of the court, or of the parties, or of the public, when that receivership was created, nor down to the compromise decree of 1864.

It is plain that the Vermont & Canada Railroad Company, and mortgage bondholders of the Vermont Central Railroad Company, hold a position relative to the subject, different from that of the creditors of the trust. The ground of right and claim of the former was the lease of the one, and the bonds and mortgages of the other. It was to render available the right of each respectively that the compromise decree was made and went on in execution. The management and administration were subjugated to the legal incidents and consequences thereof; and we do not understand it to be controverted, that the expenses properly incurred are to be paid, before the beneficiaries of the trust are entitled to partake of the earnings. The contest has been against making such expenses a charge upon the *corpus* of the property, in priority to other rights and interests, in such a sense and manner as to render the sale asked for lawful and needful.

The creditors of the trust, as they are called, have become such by transactions having reference to the carrying on of the business and administration of the management under the compromise decree. Primarily, that business and management were not carried on for their interest and benefit, and not at all for their benefit, except as they were interested in such success as would make sure the payment of their claims. It is true that the managers were to hold and use the pledged equipments, and out of car service were to earn money to pay on those claims; but that was not in such a way or sense, as to make the pledgees chargeable with the expense of such *use and service*. That use and service were in the administration that was going on for the behoof of the primary parties, and at the charge of such administration.

It may now be said, summarily, as the result in this respect, that the Vermont & Canada Railroad Company stand upon their lease, under the compromise decree, and the decrees and orders

following, with the right to have the stipulated rent paid out of the net earnings. Subject to this, the mortgage bondholders of the Vermont Central Railroad Company stand upon their mortgages, under the compromise decree, and the decrees and orders following, with the right to have the net earnings appropriated according to the respective provisions in that behalf. "*Net earnings*" means what is left after paying the legitimate cost and expense of making earnings by use of the property.

The holders of the trust bonds stand upon the rights created and vested by the respective transactions constituting the issue, appropriation, and receipt thereof respectively, including a right to the security provided, according to the legal effect of the provision making such security. The bonds were taken for the required consideration, in faith of the promise to pay interest and principal as stipulated, and in reliance on the security provided and pledged. This vested in the bondholder the right resulting from the transaction by the legal effect of the promise, and to the security pledged. This is in no manner affected by the fact that the promise may not be performed, and the security may prove inadequate and worthless. Of course the bond-buyers knew what they were buying, viz., a bond issued and secured in the carrying on of the management of the property by the persons in charge, as such management was shown by the records, and files, and official documents to have been created and carried on, and which might continue to go on indefinitely in the uncertain future. In view of this, each bondholder took the hazard of both the present and prospective value of his bonds, as depending on the ability of the promisor and the value of the security. If it should turn out that the pledged property had been used up, or become worthless, and the *car service* fruitless, and the guaranty of the Vermont & Canada Railroad Company a barren resource, that would not touch the validity and operative force of the contract and the pledge.

In this connection, supplementing a remark already made, it occurs to be said, that if it were to be held that all the property in the manager's hands would, as against the original parties, be

chargeable with the debts of the management, the property thus specifically pledged would, as against the pledgees, be chargeable subject to such pledge.

It is not deemed needful for present purposes to decide or debate, whether the holders of the secured bonds are, on the one hand, limited to the security as their resource for getting payment of their bonds ; or, on the other, are to be regarded as having all the rights of unsecured creditors, with the security superadded. Nor is it needful to decide or debate the operation and effect, in the order of April 20, 1872, for the loan of $2,500,000, "that the notes issued under this decree shall constitute a lien and charge upon the trust property, under the control of said trustees and managers, and the earnings thereof."

As to what is called the "floating debt," which rests upon the credit given to the trust management, the reason is not obvious why that debt should have precedence to any other of the trust debts,—*trust debts*, as distinguished from the claims of the Vermont & Canada Railroad Company and the Vermont Central bondholders. The secured trust debts were contracted in the carrying on of the business of the management, for the purposes contemplated and sought to be accomplished by the managers, just as the floating debt has been contracted, and for the same purposes. It can make no difference whether that debt is due to outside parties, or to the party managing. It is equally on the credit of the trust. The fact that it is without specific security does not give it a higher rank, or a different right, from debts with security. It stands upon the credit which induced the contracting of it, viz., the promise of the managing party in view of ability and means for payment, just as the secured debts stand on the same credit, and the security provided. What is now claimed is, that that debt shall have precedence of the other trust debts, making it first in right as to means of payment, even to the appropriation of the security pledged for the payment of the other debts. There would be no warrant for this, even in case of a proper receivership. The trust is the debtor to each and all its creditors. In the settlement of insolvent estates of deceased debtors the statute

gives priority to doctor's bills, and other expenses of the last sickness, and funeral charges.   But we know of no statute or rule of law that would warrant the priority claimed in this case.

For the purpose for which the case is now before the court, we do not design, nor would it be proper, to go beyond the needs for disposing of it with reference to that purpose, in determining the *status*, rights, and liabilities of the respective parties and interests.   When specific rights are claimed, and specific liabilities sought to be enforced, then will be the proper time and occasion for considering and determining what may be specifically before the court in that behalf.

As already said and sufficiently shown, the position and office of the Central Vermont Railroad Company is to be regarded, not as that of a receiver, in the sense of the law, but of managing agent for the parties in interest, having the character and office of an administrative trust.   Its primary relations are to and with the *cestuis que trust*, and its claim for outlay, and service, and expenses incurred, is to be considered, established, and satisfied with reference to that relation.

In view of that relation, is there any warrant of law for ordering a sale of the property ?   No case and no book has been presented, or come to our notice, in which it has been propounded or held, that, in a real receivership for managing property, to realize profits by use, and not with a view to its ultimate sale, and the realization of money assets thereby, the property has been or should be sold to realize means for paying charges incurred in the management.   The cases are numerous of sales by receivers under the order of the Court of Chancery.   But no case is found in which such sale has been ordered as a means of reimbursing receivership expenses in virtue of a lien in that behalf.

Upon the proposition in the brief for the petitioners, that " the ordinary power to enforce a lien in chancery is by a sale," four citations are made, viz., *Crane* v. *Ford*, 1 Hopkins, 114, which was to adjust the rights of the parties to a steamboat, and for an account.   A receiver had been appointed of all moneys due, or to become due, for the earnings of the boat ; and under his direction it had been navigated two years.   The complainants asked

to have it sold, for the reason that it was found to be in arrear to the receiver, and could not be more profitably employed in the future. The court ordered the sale, saying: "This court must have a power to sell the subject of the litigation, whenever such a measure becomes necessary to preserve the interests of the parties. In this case the vessel has sailed under the direction of a receiver for two years, and must be fitted out for another season or lie useless; and it is highly inconvenient and unfit that such operations should be conducted under the direction of this court for so long a time."

There was no question of a receiver's lien here, and the ordering of the sale had no reference to a lien of any kind. It was sold because it was "necessary to preserve the interests of the parties." The litigation between the parties was still going on. Not such is the case we have in hand.

The case of the *Chetaque Bank* v. *White*, 2 Selden, 236, was a creditor's bill, to get satisfaction of a judgment out of real estate that the debtor had fraudulently conveyed. A receiver was appointed of the property in controversy. The conveyance was set aside, and the court, having the case in hand, ordered a sale as the means of satisfying the judgment, instead of turning the creditor over to the levy and sale on execution. There was no matter of lien in this case of the receiver or anybody else. It was a sale in satisfaction of a judgment which charged the property.

The case of *McCalmont* v. *Lawrence*, 1 Blatch. 232, is of the same kind, though cited to another point.

The case of *Railroad Co.* v. *James*, 6 Wall. 750. The railroad company owned the road-bed in fee, and by the statute of Wisconsin the rolling stock is a fixture. In that State judgments are liens on real estate. That was a suit to enforce such a judgment by a sale of the property. The sale was ordered and the order was affirmed on appeal. Here was no question of a receiver's lien. There was no receiver in the case. It was a sale in due course, in satisfaction of a judgment, under the laws of the State.

Perry on Trusts, c. 25, s. 764, is cited. It reads: "A trustee is seldom justified in selling the trust estate without an express or implied authority conferred on him by the instrument of trust.

Vermont & Canada R. R. Co. v. Vermont Central R. R. Co. et als.

If no power of sale is contained in the instrument, courts of equity upon cause shown, may decree a sale," etc. The book is silent as to what cases would warrant a decree of sale. Obviously it is where a sale would serve the purposes for which the trust was created. Our trust is not to be executed by a sale. If a sale should be ordered, it would be as a matter of legal necessity, and against, and in defeat of, the purposes for which it was created and has gone on.

The citations furnish no support or countenance to the sale that is asked, upon the reason assigned for the asking. If anything more to the point is to be found, it cannot be supposed that the array of learned counsel for the petitioners would have overlooked it.

If it were to be now held that the property itself, in the hands of the Central Vermont Railroad Company, is subject to the lien as claimed, such lien would not warrant an order of sale in the first instance. It would be a redeemable lien, resting upon the property in the character of an equitable mortgage ; and a sale would be ordered in any event, only on failure to redeem according to the final decree in that behalf.

As the prayer of the petition for the sale of the property cannot be granted, there is no occasion to further consider or discuss the relation of the various interests in the property to the lien and charge upon it, as claimed in the petition, or that may otherwise exist.

The avowal of counsel in opening the argument for the petitioners, that the purpose for which the sale was sought was the transfer and confirmation of the title of the property, does not present a ground or reason of which the court can take judicial cognizance in considering the question of legal authority and legal duty in the premises. However desirable, for economical reasons, —however desirable on the score of good policy, that such transfer of title should be made, the action of the court must be governed and controlled by the law as involved in and applicable to the grounds and prayer set forth in the petition, viz., that the trust debt, as set forth, is a charge and first lien upon the railroads and property named ; and that the only means whereby to raise money

to meet said payments and extinguish said debts, is a sale of said trust property.

The ." *scandal*" spoken of by the counsel as being rife, touching the railroad management in question, is equally beyond the cognizance and consideration of the court in deciding the questions presented by the case that is before us upon the records and evidence. That line of public service hardly falls to the cognizance of courts and judges, especially when they are the subjects of it, except in special cases under provisions of the law. They have to do only with the performance and discharge of official service and duty under the law, upon their personal and official responsibility, leaving what may be said about it to the judgment and taste of those who, with whatever regard or disregard of the truth of facts, of honesty, and of justice may chance, exercise the prerogative of comment, criticism and abuse, in reference to whatever is done, or omitted to be done, by the courts and judges.

In this connection it is pertinent to be said, that it is not the province of the court to volunteer action in causes, but to act upon applications made by interested and proper parties. So long as such parties refrain from applying to the court for specific action, that court refrains from acting. When application is made, the court is to act upon it as, in the judgment of the court, to law and justice appertains. And in this regard, it is prominent for notice, and to be heeded, that such applications, and the action to be had upon them, are subject to established principles, rules, and usages, known as the " law of procedure "; and that this law, as governing in the ascertainment of disputed rights and remedies, becomes practically essential to the rights and remedies brought in question.

This is clearly and sharply brought out in *Windsor* v. *Mc Veigh*, 93 U. S. Rep. 274; 20 Vt. 65; Herman on Estoppel, 119, s. 114, cited by Judge PROUT. In the case first cited, which also is cited by Mr. Walker, it is said : " All courts, even the highest, are more or less limited in their jurisdiction. * * * Though the court may possess jurisdiction of a cause, of the subject-matter, and of the parties, it is still limited in its modes of procedure. * * * It must act judicially in all things. * * * A departure from established modes of procedure will often render the judgment

void. The decree of a court of equity upon oral allegations, without written pleadings, would be an idle act, of no force beyond that of an advisory proceeding by the chancellor, and courts are not authorized to execute their power in that way."

It is matter of common learning and frequent experience, that remedies asked for, in matters proper for remedy, are not granted because the process and proceeding are not according to the law in that respect.

Again, the fact that the existing system of managing the property, " is cumbrous and unwieldy, and attended with large and disproportionate expense," does not constitute a ground or element upon which the law operates as the basis of authority in the court, to the intent of the action asked for in this case. Such fact may render it desirable in an economical view that the system should be changed. But what the court may be authorized by the law to do in reference to the asking in this case, is not affected by that fact.

Nor does the plan of reorganization, as it is called, fall within the cognizance of the court. The court is asked to order a sale, and to marshal and distribute the proceeds. What may ensue thereafter is not brought within the scope of judicial action by the court. That plan, therefore, has no bearing on the authority of the court to act upon the pending petition. That could come under action by the court only on consent of all parties in interest; and any order or decree in that behalf would be, as was the compromise decree of 1864, a consent decree. And although what has been done under that decree may be binding and effectual to every intent contemplated thereby, it does not follow that the court may, without the consent and against the will of interested parties, proceed to do other things with reference to the results of that decree, the same as if what has been done, and the results thereof, were within the scope of the original bill, mandate, and decree. Indeed, when any specific measure is proposed for the action of the court, if such action is not agreed to, it is at least questionable whether the court would not be bound to find its warrant for ordering the measure in the original bill and decree.

75

In this case substantial and largely interested parties, who were made defendants in the petition, appear, answer, and oppose. They are their own representatives for all the purposes of the litigation, and stand upon their individual several rights, not affected or compromised by the action of others having the same class of interest and right, nor by the action of representative officers, holding trust relations to certain interests, and looking to the service of certain interests. The position of trustees in railroad mortgages is sufficiently indicated by what was held in *Miller and Knapp* v. *Rut. & Wash. R. R. Co.*, 36 Vt. 452, in which, on p. 483, it is said : " That in reference to the security, for holding, enforcing, and administering it according to the provisions of the trust, the trustees are the agents of the parties interested and entitled by reason of being bondholders ;" and applicable equally to such trustees is what was held and said in *Stevens* v. *Willard*, 43 Vt. 692, to the effect that it was not their legitimate province to do acts in destruction, instead of upholding and rendering effectual the trust.

The position and action of the trustees of the Vermont Central mortagees in this petition do not bind or affect any bondholder who does not consent to and concur in such position and action.

And this is emphatically true as to the *receiver*—claimed in petitioner's brief to represent all creditors. Whatever might be true in a proper receivership in that respect, in this case, in which the receiver is the principal party in interest in the subject-matter of the petition, and the purposes sought by the petition, such receiver cannot, with show of reason or of legal right, be regarded as representing creditors holding a hostile position to the interests and askings by it made.

However we may personally regret that the enterprise put on foot by the decree of 1864, as it has gone on, has failed in proposed and expected results, and that embarrassments are serious, and complications are as yet unsolved by any means that have been attempted, it does not behoove the court, for the purpose of making " an end all " of this *hydra* of contention, bitterness, loss and litigation, to pronounce as law what is not law—to adopt and authorize measures not known to nor warranted by the law in such

a case.   Everybody but culprits who are in danger of " feeling the halter draw," subscribe to, and insist on, the maxim, " *fiat justitia ruat cœlum.*"   The *justitia* of that maxim means, legal justice—justice evolved and made operative by the administration of the law.   Railroads and interests in railroads, both personal and public, are subject to the principle and sentiment of that maxim.   The parties have produced the troublesome case.   The law, in its administration, can give relief only by lawful means.

The *pro-forma* decree of the Court of Chancery dismissing the petition is affirmed.   A mandate will be sent down to that effect.